30 F.3d 289
 RICO Bus.Disp.Guide 8600
 GICC CAPITAL CORP., Plaintiff-Appellant,
v.
TECHNOLOGY FINANCE GROUP, INC., Andrew Graham, Dennis
Williamson, Graham & Williamson, Gordon Locke, Creative
Resources, Inc., TFF, Inc., Apple Leasing, Inc., James T.
Pierce, Walter H. Prime, TFG Acquisition Corp., and Arthur
Kronenberg, Defendants-Appellees.
 No. 1189, Docket 93-7982.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 24, 1994.
Decided July 11, 1994.
 
 Richard P. Swanson, New York City (Reid & Priest, Pamela C. Tames, of counsel), for plaintiff-appellant.
 Frederic S. Ury, Westport, CT (Rubenstein and Ury, of counsel), for defendants-appellees Technology Finance Group, Inc., TFG Acquisition Corp., and Arthur Kronenberg.
 Anthony DeToro, New York City (Baer Marks & Upham, Eugene R. Scheiman; Zeldes, Needle & Cooper, Bridgeport, CT, David P. Atkins, of counsel), for defendants-appellees Andrew Graham, Dennis Williamson, Graham & Williamson, Creative Resources, Inc., TFF, Inc., Apple Leasing, Inc., James T. Pierce, Walter H. Prime and Gordon Locke.
 Before: LUMBARD, VAN GRAAFEILAND, and JACOBS, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 GICC Capital Corporation (Capital) appeals from a September 2, 1993 judgment of the District of Connecticut (Eginton, J.), dismissing Capital's amended complaint. The district court adopted a June 15, 1993 report of Magistrate Judge Arthur H. Latimer recommending dismissal of Capital's claims. Capital, a New York corporation with its principal place of business in New York City, sued numerous defendants who allegedly participated in the looting of assets from defendant Technology Finance Group, Inc. (TFG), a Delaware corporation with its principal place of business in Westport, Connecticut. TFG defaulted on a note that it issued to Capital in settlement of an unrelated litigation. Capital alleges that the note's issuance and the looting of TFG were part of a scheme to defraud Capital by escaping the note and settlement obligations. Capital claims that the scheme violated, among other things, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Secs. 1961, 1963. The district court dismissed Capital's RICO claim on the ground that the looting of TFG proximately caused harm only to TFG and not to Capital, and that Capital therefore lacks RICO standing. We reverse.
 
 I.
 
 2
 For purposes of this decision, we take the allegations of the complaint to be true and construe the complaint in Capital's favor. Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). In March 1990, a principal of Capital settled an unrelated litigation with TFG (to which Capital was not a party) by accepting a promissory note from TFG to Capital for $500,000. The note bore interest of 10% from April 1, 1990 through December 31, 1995. No payments were due until January 1, 1991. Accrued interest of $37,500 was added to the principal on January 1, 1992. From January 1, 1991 to December 31, 1991, only monthly interest of $4,166.57 was due. From January 1, 1992 to December 31, 1995, monthly interest plus principal of $17,343.65 was due at the end of each month. Failure to remit any payment within ten days of a due date, and further failure to cure within fifteen days after receipt of written notice from Capital, entitled Capital to accelerate payment and declare the full amount due and payable.
 
 
 3
 TFG made the first seven interest payments in 1991 and the interest plus principal payments through November 1992. In December 1992, TFG defaulted and Capital declared the full balance due and payable. TFG did not respond. The amount due stands at $407,021.07, with per diem interest of $110.66 since December 28, 1992. TFG allegedly has no prospect of making payment, but so far has not filed for, or been placed into, bankruptcy.
 
 
 4
 TFG's business was in "sale-and-leaseback" transactions that took advantage of certain tax provisions in the 1980s. TFG borrowed funds to purchase office computer equipment, leased the equipment to a user, and directed the user's lease payments to the lender as payment on the loan. At the same time, TFG sold the equipment to an investment trust that leased the equipment back to TFG. The trust investors gained depreciation and other tax benefits.
 
 
 5
 The user leases lasted as long as the terms of the loans that TFG obtained to purchase the equipment. The trust leases lasted longer. When a user lease expired and the loan had been paid off, the equipment would be leased to a second user. The payments by the second user did not have to be directed to a lender, and thus were available as profits, or "residuals." TFG took a share of the residuals and remitted the balance to the investment trust.
 
 
 6
 TFG increased its profits by repurchasing trust investors' interests for less than the amount of profits due to flow to the investors. It is unclear why trust investors agreed to this. Capital suggests that TFG advised trust investors that their interests were worth very little. Defendant Dennis Williamson states that the trust investors were given "realistic, but conservative" estimates. At any rate, trust investors' interests were repurchased, and TFG collected all of the payments from the corresponding second-user leases.
 
 
 7
 Defendant Creative Resources, Inc. (CRI), a Nevada corporation with its principal place of business in Westport, Connecticut, is a holding company that conducts business through a group of subsidiaries. CRI was controlled, during the times relevant, by defendants Andrew Graham, Dennis Williamson, Gordon Locke, Walter H. Prime, James T. Pierce, and Graham & Williamson (a partnership of defendants Graham and Williamson).
 
 
 8
 Until at least 1989, CRI owned TFG through defendant TFF, Inc. (TFF), a Delaware corporation having its principal place of business in Westport, Connecticut and itself a holding company. TFG owned a subsidiary, defendant Apple Leasing, Inc. (Apple), also a Delaware corporation with its principal place of business in Westport, Connecticut. A straight line of ownership thus existed from CRI to TFG to Apple.
 
 
 9
 Capital alleges that a series of transactions by the defendants from 1989 to 1991 fraudulently stripped TFG of its assets and inevitably resulted in TFG's default on the note. First, at some time after June 1989, the corporations were reorganized so that Apple became a subsidiary of CRI and not of TFG. The straight line became a triangle. The alienation of Apple deprived TFG of second-user lease payment income to which Apple held rights and from which TFG would have benefited as Apple's parent.
 
 
 10
 Second, CRI caused subsequent repurchase transactions to be made by Apple instead of TFG, or to be made by TFG and immediately sold to Apple at no profit to TFG. CRI facilitated the repurchases by loaning the necessary funds to Apple rather than TFG. CRI even caused TFG to act as Apple's collection agent, for no compensation. CRI couched the transfer of residuals as repayment of the intracorporate loans. The result was a stream of profits that flowed through Apple to CRI, bypassing TFG and its creditors. CRI thus used Apple to siphon TFG's business opportunities and leave TFG an empty shell incapable of meeting its obligations. These transfers favored CRI at the expense not just of Capital and other creditors, but of trust investors, who were not paid in some cases. Capital alleges that over $2 million in residuals were thus diverted.
 
 
 11
 Third, CRI transferred over $1 million of the improperly diverted funds to one of its overseas subsidiaries: TALK Software Ltd. in London. Capital alleges that the purpose of the overseas transfer was to frustrate the collection of TFG's debt.
 
 
 12
 Fourth, in February 1991, CRI caused TFF to sell the remains of TFG to a new shell company, defendant TFG Acquisition Corp. (TFG Acquisition), a New Jersey corporation with its principal place of business in Newark, New Jersey, for the nominal sum of $10,000. TFG Acquisition is owned by defendant Arthur Kronenberg, who had previously acted as TFG's attorney. As part of the transaction, CRI forgave $1.1 million owed by TFG to CRI, CRI gave TFG rights to $300,000 in residuals, and TFG released CRI from all claims TFG might have had against CRI. TFG's officers and directors resigned. TFG thus was cast adrift without recourse against CRI, CRI's subsidiaries or CRI's controlling persons. CRI, meanwhile, was relieved of the burdens of holding an insolvent subsidiary.
 
 
 13
 Capital supports its allegations by reference, among other things, to CRI's Securities and Exchange Commission filings which allegedly contain admissions and evidence of the diversions and evidence of the amount diverted and the amount transferred overseas.
 
 
 14
 In September 1991, Capital filed this suit in the District of Connecticut. The complaint contained claims under federal law for securities fraud and RICO violations, and under state law for fraudulent conveyance and unfair trade practices. Although TFG had not yet defaulted on the note (the default came in December 1992), Capital alleged that defendant TFG was being stripped of its assets by other defendants, and that default was imminent.
 
 
 15
 In October 1991, defendants filed motions to dismiss the complaint. They asserted that Capital failed to state a federal claim and that the district court should decline jurisdiction over the remaining state law claims. In December 1991, the district court referred the motions to the magistrate judge for report and recommendation. In February 1992, the magistrate judge recommended that the motions be granted because TFG had not yet defaulted on the note and the suit therefore was "premature and speculative." Later that month, Capital filed objections to the recommendation. Defendants filed oppositions to Capital's objections.
 
 
 16
 In August 1992, the district court heard argument on the pending recommendation and objections, and reserved decision. Meanwhile, in December 1992 TFG defaulted on the note. In January 1993, the district court referred the matter back to the magistrate judge for reconsideration.
 
 
 17
 In March 1993, Capital filed an amended complaint to allege and add a state law claim for TFG's default. The amended complaint seeks compensatory relief in the amount of the unpaid principal of $407,021.07 under federal securities law and state default and fraudulent conveyance law; actual, treble and punitive damages in the amount of at least $1,500,000 under RICO and state unfair trade practices law; punitive damages of at least $1,000,000; and prejudgment interest, costs and fees.
 
 
 18
 After a hearing, the magistrate judge in June 1993 recommended that the motions be granted. He reasoned that Capital: (1) failed to state a federal securities claim because the note was not a security; and (2) lacked standing under RICO because the amended complaint's allegations of looting did not describe "specific acts directed at Capital," but only acts directed at TFG with respect to which Capital's harm was "necessarily incidental ... and derivative" and thus inadequate to establish the proximate cause required for RICO standing. He also recommended that the district court decline jurisdiction over the remaining state law claims.
 
 
 19
 In July 1993, Capital filed objections to the recommendation. Defendants filed oppositions to Capital's objections. In August 1993, the district court adopted the magistrate judge's recommendation and dismissed the amended complaint.
 
 II.
 
 20
 Capital appeals the dismissal of its RICO claim. It asserts that the district court misread the precedents in concluding that it lacks RICO standing. We agree that Capital has standing, and reverse.
 
 
 21
 Capital's allegations satisfy the proximate cause requirement for RICO standing. Holmes v. Securities Investor Protection Corp., --- U.S. ----, ---- - ----, 112 S.Ct. 1311, 1316-18, 117 L.Ed.2d 532 (1992); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769-72 (2d Cir.1994); Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir.1990). Capital alleges that defendants looted TFG "deliberate[ly] and ... with the intent to damage [Capital] by impairing TFG's ability to pay its obligations to Capital and to TFG's other general unsecured creditors, rendering TFG insolvent, and in effect subordinating the Capital debt to CRI's purported debts when it should be CRI which is subordinated." Capital alleges that
 
 
 22
 [a]t no time during the negotiation of the terms of issuance of the [note] ... did ... defendants ever disclose that, at the same time they were agreeing to cause TFG to issue the [note] ... they were also stripping TFG of sufficient assets to meet the obligations contained in the [note].... Defendants' failure to disclose their ongoing plan to strip TFG of assets was willful ... and did cause Capital to accept delivery of the [note].... Had Capital known of defendants' ongoing plan to strip TFG of assets it would not have accepted the [note], at least not without a guarantee from CRI.
 
 
 23
 Capital further alleges that defendants engaged in a "systematic campaign of looting TFG and fraudulently conveying its assets to CRI, in derogation of the rights of TFG's creditors."
 
 
 24
 Capital's allegations--the note's timing (just after the alleged looting began) and magnitude ($500,000) and the rapacious nature of the alleged looting--fairly posit the directness of injury required for RICO standing. Cf. First Nationwide, 27 F.3d at 770-72. When a corporation fraudulently is caused to issue debt and stripped of its assets in a manner that obviously will leave the creditors unpaid, those creditors have standing. Their injury is "reasonably foreseeable or anticipated as a natural consequence." Hecht, 897 F.2d at 24; see also Ceribelli v. Elghanayan, 990 F.2d 62 (2d Cir.1993); Stochastic Decisions, Inc. v. DiDomenico, 995 F.2d 1158 (2d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 385, 126 L.Ed.2d 334 (1993); Standardbred Owners Association v. Roosevelt Raceway Associates, L.P., 985 F.2d 102, 104-05 (2d Cir.1993); Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1100-01 (2d Cir.1988), cert. denied, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).
 
 
 25
 Bankers Trust and Stochastic are especially pertinent. The plaintiff in Bankers Trust accepted a reorganization plan unaware that the defendant had conveyed assets. The plaintiff in Stochastic was a judgment creditor whose collection of the debt was frustrated when the defendants stripped the judgment debtor corporation of its assets. Here, Capital allegedly accepted a litigation settlement unaware that defendants had conveyed assets, and Capital's collection was frustrated when defendants stripped TFG of its assets. Capital's claim is squarely within the compass of our past decisions regarding standing.
 
 
 26
 Defendants cite our recent decision in Manson v. Stacescu, 11 F.3d 1127 (2d Cir.1993),[1] which states a general rule against creditor standing under RICO, id. at 1130, and compares creditors to shareholders based on the ordinarily derivative nature of injury, id. at 1131. Manson characterized Bankers Trust as a "narrow exception" that arose where the creditors were "forced to defend against frivolous lawsuits filed to harass them and to cause them monetary loss over and above that caused by the company's bankruptcy" and where the defendants "had made a fraudulent conveyance for the direct purpose of insulating the corporation from its creditors." Manson, 11 F.3d at 1130. Cf. Wooten v. Loshbough, 951 F.2d 768, 771 (7th Cir.1991). Defendants here contend that Capital's injury was indirect because the looting did not specifically target Capital as opposed to other creditors.
 
 
 27
 We are not persuaded by the citation to Manson. The law of RICO standing, as stated in Bankers Trust, distinguishes creditors from shareholders whose lack of standing to sue for wrongs to a corporation is recognized "throughout corporate law." Bankers Trust, 859 F.2d at 1101. The question remains one of proximate cause, which we find adequately alleged here.
 
 
 28
 Defendants contend that the appropriate remedy for a general unsecured creditor like Capital is a state court action. They surmise that Capital is in federal court only because of RICO's treble damages provision. The possibility of a state court action, however, does not preclude Capital's standing to pursue federal claims in federal court.
 
 
 29
 Defendants request that we affirm the decision of the district court even if we resolve the standing issue against them. They assert that Capital fails to allege a pattern of racketeering activity or a relationship among the predicate acts and the enterprise, fails to state a claim under Secs. 1962(a), (b) or (c), and fails to plead fraud with particularity. The district court did not address these assertions because it disposed of the RICO claim on the ground of standing. We think it better for these matters to be addressed by the district court in the first instance.
 
 
 30
 We have considered defendants' remaining arguments and find them to be without merit.
 
 
 31
 Reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Capital filed a brief as amicus curiae in support of the eventually unsuccessful appellants in Manson