191 F.3d 229 (2nd Cir. 1999)
 LABORERS LOCAL 17 HEALTH AND BENEFIT FUND; TRANSPORT WORKERS UNION NEW YORK CITY PRIVATE BUS LINES HEALTH BENEFIT TRUST, on behalf of themselves and all others similarly situated; UNITED FEDERATION OF TEACHERS WELFARE FUND; COMMUNICATIONS WORKERS OF AMERICA LOCAL 1180 SECURITY BENEFITS FUND; INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL 891 WELFARE FUND and SOCIAL SERVICE EMPLOYEES UNION LOCAL 371 WELFARE FUND, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees,
v.
PHILIP MORRIS, INC.; R.J. REYNOLDS TOBACCO COMPANY; BROWN & WILLIAMSON TOBACCO CORPORATION, USA; B.A.T. INDUSTRIES, P.L.C.; LORILLARD TOBACCO CO.; LIGGETT & MYERS, INC.; AMERICAN TOBACCO COMPANY; UNITED STATES TOBACCO COMPANY; COUNCIL FOR TOBACCO RESEARCH-U.S.A., INC.; TOBACCO INSTITUTE, INC.; SMOKELESS TOBACCO COUNCIL, INC. and HILL & KNOWLTON, INC., Defendants-Appellants.
 August Term, 1998
 
 Docket No. 98-7944
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: February 4, 1999
Decided: April 09, 1999
Amended: August 18, 1999
 Having consented to rule on the questions certified to us by the district court under 28 U.S.C. §1292(b) (1994), we answer the first certified question, with respect to the remoteness of the alleged harm, in the affirmative; the second question, with respect to federal preemption, thereby becomes moot. We therefore reverse the district court order denying defendants' motion to dismiss, and remand the case to the district court with instructions to dismiss the complaint.
 Reversed and remanded to the district court.[Copyrighted Material Omitted]
 HERBERT M. WACHTELL, New York, New York (Peter C. Hein, Wachtell, Lipton, Rosen & Katz, New York, New York; Paul K. Stecker, Paul F. Jones, Charles R. Chase, Phillips, Lytle, Hitchcock, Blaine & Huber LLP, Buffalo, New York; David S. Eggert, James M. Rosenthal, Arnold & Porter, Washington, D.C., for Defendant-Appellant Philip Morris, Inc.; Robert W. Gaffey, Michael S. Chernis, Jones, Day, Reavis & Pogue, New York, New York; Robert F. McDermott, Jr., Donald B. Ayer, Jones, Day, Reavis & Pogue, Washington, D.C., for Defendant-Appellant R.J. Reynolds Tobacco Co.; Marjorie Press Lindblom, Peter A. Bellacosa, Kirkland & Ellis, New York, New York; David M. Bernick, Kirkland & Ellis, Chicago, Illinois; Kenneth N. Bass, Jennifer Gardner, Paul B. Taylor, Kirkland & Ellis, Washington, D.C., for Defendant-Appellant Brown & Williamson Tobacco Corp. (including as successor by merger to Defendant-Appellant The American Tobacco Co.); Alan E. Mansfield, Greenberg Traurig, New York, New York; Robert E. Northrip, Bruce R. Tepikian, Samuel B. Sebree, Shook, Hardy & Bacon, L.L.P., Kansas City, Missouri, for Defendant-Appellant Lorillard Tobacco Co.; Michael M. Fay, Kasowitz, Benson, Torres & Friedman, New York, New York, for Defendant-Appellant Liggett & Myers, Inc.; Peter J. McKenna, Eric S. Sarner, Mark S. Cheffo, Skadden, Arps, Slate, Meagher & Flom LLP, New York, New York, for Defendant-Appellant United States Tobacco Co.; Steven Klugman, Debevoise & Plimpton, New York, New York, for Defendant-Appellant The Council for Tobacco Research-U.S.A., Inc.; Anthony Mansfield, Seward & Kissel, New York, New York, for Defendant-Appellant The Tobacco Institute, Inc.; Barry S. Schaevitz, Jacob, Medinger & Finnegan, LLP, New York, New York, for Defendant-Appellant Smokeless Tobacco Council, Inc.; Bruce M. Ginsberg, Michael C. Lasky, Davis & Gilbert, New York, New York, for Defendant-Appellant Hill & Knowlton, Inc.), of counsel and on the joint brief for Defendants-Appellants.
 MICHAEL C. SPENCER, New York, New York (Melvyn I. Weiss, Kenneth J. Vianale, Beth A. Kaswan, Joan T. Brown, Milberg Weiss Bershad Hynes & Lerach LLP, New York, New York; Robert J. Connerton, James R. Ray, John McN. Broadus, Connerton & Ray, Washington, D.C.; Perry Weitz, Robert J. Gordon, Jerry Kristal, Mitchell Breit, Karen J. Sabine, Weitz & Luxenberg, P.C., New York, New York; Christopher P. O'Hara, Colleran, O'Hara & Mills, Garden City, New York; Stephen F. Gordon, Joel Spivak, Mirkin & Gordon, P.C., Great Neck, New York; Professor G. Robert Blakey, Notre Dame Law School, Notre Dame, Indiana; Professor Einer Elhauge, Harvard Law School, Cambridge, Massachusetts, of counsel), for Plaintiffs-Appellees.
 Carl R. Schenker, Jr., Washington, D.C. (John H. Beisner, Teresa Kwong, O'Melveny & Myers LLP, Washington, D.C.; Hugh F. Young, Jr., Product Liability Advisory Council, Inc., Reston, Virginia; Jan S. Amundson, General Counsel, National Association of Manufacturers, Washington, D.C.), of counsel and on the brief for Amici Curiae Product Liability Advisory Council, Inc. and National Association of Manufacturers in Support of Defendants-Appellants.
 Laurence J. Cohen, Sherman, Dunn, Cohen, Leifer & Yellig, Washington, D.C., for Amicus Curiae National Coordinating Committee for Multiemployer Plans in Support of Plaintiffs-Appellees.
 Before: CARDAMONE, CABRANES, and STRAUB Circuit Judges
 Defendants Philip Morris, Inc. and other tobacco companies appeal from an order entered March 26, 1998 in the United States District Court for the Southern District of New York (Scheindlin, J.), denying, in part, their motion under Fed. R. Civ. P. 12(b)(6) to dismiss the complaint of plaintiffs Laborers Local 17 Health and Benefit Fund, et al., on grounds, inter alia, that the harm plaintiffs complain to have suffered from defendants' alleged tortious acts is too remote to sustain a recovery.
 CARDAMONE, Circuit Judge:
 
 
 1
 Plaintiffs Laborers Local 17 Health & Benefit Fund and the Transport Workers Union New York City Private Bus Lines Health Benefit Trust are labor union health and welfare trust funds established pursuant to the Taft-Hartley Act and the Employee Retirement Income Security Act, 29 U.S.C. §§1002(1), 1002(3), 1003(a) (1994) (ERISA), for the purpose of supplementing employees' basic medical benefits by providing death, disability, and related services. Plaintiffs United Federation of Teachers Welfare Fund, Communications Workers of America Local 1180 Security Benefits Fund, International Union of Operating Engineers Local 891 Welfare Fund, and Social Service Employees Union Local 371 Welfare Fund are not-for-profit trusts which were established to supplement public-sector employees' basic medical benefits. We refer to all of the plaintiffs collectively as plaintiffs or Funds.[1]
 
 
 2
 The Funds brought suit on June 19, 1997 in the United States District Court for the Southern District of New York (Scheindlin, J.) alleging that defendants, major tobacco companies[2] and their agents (defendants, tobacco companies, or appellants), had engaged in a conspiracy to deceive the general public, and to deceive plaintiffs specifically, with respect to the health risks associated with smoking, in order to shift the health-related costs of smoking to plaintiff Funds.
 
 
 3
 Defendants moved to dismiss the complaint for failure to state a claim, which the district court denied in part in an opinion and order dated March 25, 1998. See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 7 F. Supp. 2d 277 (S.D.N.Y. 1998) (Laborers Local 17). After obtaining certification from the district court pursuant to 28 U.S.C. §1292(b), defendants took an interlocutory appeal to this Court.
 
 BACKGROUND
 A. Plaintiffs' Complaint
 
 4
 Plaintiffs' complaint sets forth the following factual allegations, which we assume, for purposes of the motion to dismiss, are true. Over the past several decades, in response to medical indictments of smoking, the defendant tobacco companies engaged in an advertising campaign designed to mislead the public, and plaintiffs specifically, as to the true extent of the dangers that smoking poses to good health. Defendants actively concealed information that would have demonstrated the actual health risks, the addictiveness of nicotine, the effectiveness of various treatments for smoking addiction, and defendants' own ability to manufacture less addictive products. Moreover, plaintiffs and plan participants had no knowledge - until very recently - of defendants' wrongdoing. As a result, thousands of participants in plaintiffs' health care Funds became ill and/or died from smoking cigarettes produced and sold by defendant tobacco companies. Plaintiffs spent tens of millions of dollars to provide medical services for participants suffering from cigarette smoking-related diseases.
 
 
 5
 On the basis of these allegations, plaintiffs' complaint asserts ten causes of action (I to X) and seeks both monetary damages and injunctive relief requiring defendants to take appropriate corrective action. Specifically, the complaint seeks past and future damages to recover for "money expended ... to provide medical treatment to [plaintiffs'] participants and beneficiaries who have suffered and are suffering from tobacco-related illnesses." As interpreted by the district court, the complaint also seeks damages inflicted on the Funds' infrastructure independent of the harm suffered by plan participants. These latter damages, alleged to be separate and wholly distinct from participants' medical costs, consist of losses suffered due to the Funds' inability to control costs, to promote the use of safer alternative products, and to establish programs to educate their participants not to use tobacco products.
 
 
 6
 Ordinarily, plaintiffs' right to sue for damages would be subrogated to the rights of those individual smokers for whom they provided health care benefits. In other words, plaintiffs would stand in the shoes of the injured participants and recoup damages from defendants, as tortfeasors, only to the extent defendants were liable to the participants themselves. But the Funds have not asserted such a subrogation action in this complaint. Instead, they have sued in their own right for the money spent for plan participants and, in addition, for injuries and damages they insist were separate from the injuries to plan participants and that harmed plaintiffs, the welfare benefit funds themselves.
 
 B. Prior Proceedings
 
 7
 In January 1998 defendants moved to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). In an order and opinion dated March 25, 1998 and entered the following day, the district court granted defendants' motion to dismiss in part, and denied it, in part. The court granted the motion to dismiss with respect to causes of action III and IV (antitrust) and X (unjust enrichment), and it also dismissed, without prejudice and with plaintiffs' consent, the following causes of action: VII (strict liability), VIII (negligence), and IX (breach of express and implied warranties). See generally Laborers Local 17, 7 F. Supp. 2d at 294. That ruling left four causes of action remaining: the federal RICO claims (I& II); the state common-law claim of fraud, misrepresentation, and concealment (V); and the state common-law claim of assumption and breach of a special duty (VI).
 
 
 8
 In denying defendants' motion to dismiss with respect to these latter causes of action, the district court found proximate causation linking plaintiffs' injuries to defendants' asserted unlawful conduct, and thus concluded not only that the Funds had standing to assert a RICO cause of action but also that they stated a prima facie case with respect to the state common law claims. It held that a rational trier of fact could find that defendants' alleged wrongdoing proximately caused plaintiffs' alleged injuries, reasoning that the injuries were arguably (a) foreseeable and (b) not too remote as a matter of law, in light of the policy factors articulated in Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 269-70 (1992). The district court also determined that the possible availability of a subrogation remedy was no bar to the maintenance of the RICO, fraud, and breach of special duty claims. The district court ruled, in addition, that these causes of action had not been preempted by the federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§1331-1340 (1994).
 
 
 9
 Defendants then sought interlocutory appeal of those portions of the order denying their Rule 12(b)(6) motion to dismiss. When requested by defendants to certify the order for interlocutory review under 28 U.S.C. §1292(b) (1994), the district court declined to certify all of the issues defendants had raised. Instead, the court limited certification to the following two questions
 
 
 10
 Whether, under the circumstances alleged in plaintiffs' complaint, economic injuries incurred by a union health care trust fund are purely derivative of the physical injuries which its participants suffered, and are therefore too remote to permit recovery as a matter of law.
 
 
 11
 Whether the Cigarette Labeling and Advertising Act, 15 U.S.C. §§1331-40 (1994), preempts plaintiffs' state law fraud and breach of special duty claims.
 
 
 12
 Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 7 F. Supp. 2d 294, 296-97 (S.D.N.Y. 1998). On July 14, 1998 we granted leave to appeal these certified questions pursuant to §1292(b), and now reverse.
 
 DISCUSSION
 
 13
 On appeal of a motion to dismiss, we accept all of the allegations in plaintiffs' complaint as true. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id.
 
 Proximate Cause
 
 14
 The first certified question we are called upon to answer raises a question of proximate cause, namely, whether the chain of causation linking defendants' alleged wrongdoing to plaintiffs' alleged injuries is too remote to permit recovery as a matter of law. We begin by analyzing this subject in the context of plaintiffs' RICO claims.
 
 
 15
 I Proximate Cause as an Element of Standing Under RICO
 
 
 16
 The RICO provision for civil actions states
 
 
 17
 Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.
 
 
 18
 18 U.S.C. §1964(c) (1994). In Holmes, 503 U.S. at 268, the Supreme Court stated that a plaintiff's standing to sue under RICO requires "a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." To determine in a given case whether proximate cause is present, common law principles are applied. See id. at 267-68 (explaining that statutory standing under RICO encompasses common law principles of proximate cause because Congress implicitly incorporated those principles into the RICO statute) (citing Associated Gen. Contractors, Inc. v. Carpenters, 459 U.S. 519, 532-33 (1983) (AGC) (plaintiff unions barred from bringing antitrust suit to challenge allegedly coerced business relationship of third parties with nonunion firms)).[3]
 
 A. The Concept In General
 
 19
 Any discussion of proximate cause should be approached with some trepidation because, as a scholarly treatise teaches, no topic is subject to more disagreement or such confusion. Proximate cause is an elusive concept, one "always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." W. Page Keeton et al., Prosser & Keeton on The Law of Torts, §42, at 279 (5th ed. 1984) (quoting 1 Street, Foundations of Legal Liability, 110 (1906)). In everyday terms, the concept might be explained as follows: Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions. The law has wisely determined that it is futile to trace the consequences of a wrongdoer's actions to their ultimate end, if end there is.
 
 
 20
 The notion of limiting liability is well-accepted; it is its application to a given case that is more troublesome. The dictionary definition of the word "proximate" provides little assistance in this regard, limited as it is to such broad synonyms as "very near, immediately, adjoining, close." Webster's Third New International Dictionary 1828 (1981).
 
 
 21
 B. Direct Injury as a Requirement of Proximate Cause
 
 
 22
 Over the passage of time, however, courts have somewhat clarified the definition of proximate cause by identifying several traditional common law principles limiting liability whose application, in aggregate, formulates the proximate cause analysis. As noted in Holmes, "'proximate cause' [is used] to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." 503 U.S. at 268; see also AGC, 459 U.S. at 532-33, 537-38 (conducting a proximate cause analysis by looking at a "number of ... controlling" factors).
 
 
 23
 Among these "judicial tools," one notion traditionally included in the concept of proximate causation is the requirement that there be "some direct relation between the injury asserted and the injurious conduct alleged." Holmes, 503 U.S. at 268. For this reason, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." Id. at 268-69 (citing 1 J.G. Sutherland, A Treatise on the Law of Damages 55-56 (1883)); see also AGC, 459 U.S. at 532-33 & n.25; Anthony v. Slaid, 52 Mass. (11 Met.) 290 (1846).
 
 
 24
 Holmes emphasized that although the direct injury test "is not the sole requirement of [proximate] causation, it has been one of its central elements." 503 U.S. at 269 (citing AGC, 459 U.S. at 540). This language tells us that to plead a direct injury is a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause. Thus, the other traditional rules requiring that defendant's acts were a substantial cause of the injury, and that plaintiff's injury was reasonably foreseeable, are additional elements, not substitutes for alleging (and ultimately, showing) a direct injury.
 
 
 25
 We also have had occasion to observe that foreseeability and direct injury (or remoteness) are distinct concepts, both of which must generally be established by a plaintiff. For example, in Kinsman Transit Co. v. City of Buffalo, 388 F.2d 821, 824-25 & n.8 (2d Cir. 1968), defendant's ship broke loose, crashing into and collapsing a bridge, such that the debris disrupted river traffic and caused damage to plaintiffs' businesses that depended on that traffic. We ruled that even though plaintiffs' injuries were foreseeable, the damages incurred were too remote to permit recovery.
 
 
 26
 Proximate cause was lacking because those injuries were not "direct" but "occurred only because the downed bridge made it impossible to move traffic along the river"; in other words, the injuries were merely indirect and therefore too remote as a matter of law, since they were wholly derivative of an injury to the property of a third party, the bridge owner. Id. at 825; see also Dundee Cement Co. v. Chemical Labs., Inc., 712 F.2d 1166, 1168 (7th Cir. 1983) (regardless of foreseeability, plaintiff had no standing because damages derived solely as a result of injury to the person or property of another).
 
 
 27
 Although plaintiffs attempt to read our case law subsequent to Kinsman to permit recovery for indirect injuries so long as those injuries are foreseeable, those decisions, which we discuss in section II B., do not sustain such a reading since they dealt with direct, not indirect, injuries. Moreover, in light of the discussion of case law above, substituting the foreseeability test, in place of finding the existence of a direct injury, is error. As a general rule, proximate cause requires that both be present.
 
 
 28
 Plaintiffs further contend that because they assertedly meet another traditional test required for statutory torts, namely, the zone of interests test, they need not also meet the direct injury test in order to show proximate cause. Yet the zone of interests test assertedly met by plaintiffs is an inquiry "into whether, apart from the directness of the injury, the plaintiff is within the class of persons sought to be benefited by the provision at issue." Holmes, 503 U.S. at 287 (Scalia, J., concurring) (emphasis added); see also id. at 287 n.* (explaining that the zone of interests test should be viewed as an additional requirement for statutory torts, separate from the common law principles of proximate cause generally applicable to both statutory and non-statutory torts). Like the foreseeability test, such an inquiry is distinct from the direct injury test and, accordingly, may not be substituted for the direct injury test in order to establish standing under RICO. See id. at 287.
 
 
 29
 II The Direct Injury Test: Explanation and Application
 
 
 30
 As Justice Holmes writing for the Court observed in Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533 (1918), "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." Accord Holmes, 503 U.S. at 271-72 (quoting AGC, 459 U.S. at 534). For that reason, where a plaintiff complains of injuries that are wholly derivative of harm to a third party, plaintiff's injuries are generally deemed indirect and as a consequence too remote, as a matter of law, to support recovery. See Holmes, 503 U.S. at 268-69. At the same time, the Supreme Court noted the impossibility of articulating a black-letter rule capable of dictating a result in every case. See id. at 272 n.20. Accordingly, it identified three policy factors to guide courts in their application of the general principle that plaintiffs with indirect injuries lack standing to sue under RICO. See id. at 269-70. First, the more indirect an injury is, the more difficult it becomes to determine the amount of plaintiff's damages attributable to the wrongdoing as opposed to other, independent factors. Second, recognizing claims by the indirectly injured would require courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, in order to avoid the risk of multiple recoveries. Third, struggling with the first two problems is unnecessary where there are directly injured parties who can remedy the harm without these attendant problems. See Holmes, 503 U.S. at 269-70.
 
 A. Examples of Indirect Injury
 
 31
 In order to illustrate the difference between direct and indirect injuries, we review several cases on the subject. First, we examine cases where the injuries were indirect.
 
 
 32
 In Holmes, plaintiff Securities Investor Protection Corp. (SIPC) insured brokers, such that when a broker went bankrupt, SIPC was obligated by statute to reimburse the broker's customers for certain claims not satisfied by the broker's liquidated assets. SIPC alleged that Robert Holmes had conspired in a stock manipulation scheme that led to the bankruptcy of two brokers, disabling them from meeting their obligations and, as a result, triggering SIPC's statutory duty to reimburse the customers. Asserting a subrogation claim that allowed SIPC to stand in the shoes of the brokers' customers, SIPC sued Holmes under RICO for amounts reimbursed to the customers because of the bankruptcies resulting from Holmes' alleged scheme.
 
 
 33
 The Supreme Court found the plaintiffs' injuries to be indirect, because their losses were purely contingent on the insolvency of third parties, the brokers, that had resulted from defendants' actions. See id. at 271. Hence, the Court ruled that the suit by SIPC against Holmes could not stand, because the harm to the customers was too remote, i.e., there was no proximate cause. See id.; see also Manson v. Stacescu, 11 F.3d 1127, 1130-31 (2d Cir. 1993) (creditors of bankrupt corporation lacked RICO standing to sue defendants who had caused bankruptcy).
 
 
 34
 Similarly, courts have held that plaintiffs who are obligated to pay the medical expenses of another may not recover against the tortfeasor who caused the damage, because their injuries are indirect since they derive wholly from the injuries sustained by the third party. This concept is not new. An 1883 treatise cited a case where
 
 
 35
 A, who had agreed with a town to support for a specific time, and for a fixed sum, all the town paupers, in sickness and in health, was held to have no cause of action against S for assaulting and beating one of the paupers, whereby A was put to increased expense. The damage was held too remote and indirect.
 
 
 36
 1 J.G. Sutherland, A Treatise on the Law of Damages 55 (1883) (citing Anthony v. Slaid, 52 Mass. (11 Met.) at 291). And, citing a Connecticut case, the treatise goes on to say
 
 
 37
 An insurance company cannot recover from a wrongdoer, who causes the loss insured against, the money paid to satisfy such loss.
 
 
 38
 Id. at 56 (citing Connecticut Mut. Life Ins. Co. v. New York & New Haven R.R. Co., 25 Conn. 265 (1856)); see also Great Am. Ins. Co. v. United States, 575 F.2d 1031, 1033 & n.3 (2d Cir. 1978) (collecting cases) (insurer barred from suing tortfeasor directly, when tortfeasor damaged insured).
 
 B. Examples of Direct Injury
 
 39
 In contrast, a direct injury has been found when the plaintiff's injuries are not derivative of damage to a third party. For instance, in Standardbred Owners Assoc. v. Roosevelt Raceway Assocs., 985 F.2d 102, 104 (2d Cir. 1993), the defendant corporation decided to close a racetrack it owned thereby injuring the plaintiffs, a group of horse owners, trainers, drivers, grooms, and similar persons who had invested in equipment and horses for use at the track in reliance on the corporation's oral assurances that the track would stay open. The adjoining municipality had financed the defendant corporation's acquisition of the racetrack so that the track, a valuable town asset, would continue to operate. Plaintiffs endured a direct injury from the closing because the injury did not derive from harm to a third person, where the plaintiffs' injuries flowed from their own investments in the racetrack and were not derivative of injuries to the local municipality's investments in the racetrack. Id. at 104.
 
 
 40
 In Ceribelli v. Elghanayan, 990 F.2d 62, 64 (2d Cir. 1993), we ruled that the plaintiffs could proceed with their RICO claims where the defendants' misrepresentations induced plaintiffs to purchase over-valued stock from the defendants in a cooperative corporation. At the same time, we noted that standing to sue would have been "doubtful" had the plaintiffs simply alleged a diminution in the value of their shares resulting from harm to the corporation subsequent to the purchase. Id.
 
 
 41
 In Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1101 (2d Cir. 1988), a creditor brought a RICO action against the officers of the debtor corporation. The creditor had standing to bring its RICO claims only for "injuries it suffered directly." Id. These injuries included damages for defending against frivolous lawsuits initiated by the defendant officers directly against the creditor in an attempt to delay the debt collection as well as to increase the creditor's legal fees. See id. at 1099. Additionally, based upon fraudulent misrepresentations by the defendant officers that concealed the availability of a major asset, the plaintiff creditor agreed to a reorganization plan where it relinquished all but 17.5 percent of its allowed claim against the debtor corporation. Id. at 1098. This last injury was direct because it was not dependent upon any actual injury the debtor corporation may have suffered as a result of the concealment, but instead arose solely from the misrepresentation by the defendant officers to the plaintiff creditor about the status of the debtor's assets. See also Ceribelli, 990 F.2d at 63 (characterizing the injury in Bankers Trust as direct). Cf. Manson, 11 F.3d at 1130 (injury to creditors from actual diminution in debtor corporation's assets was indirect).
 
 
 42
 In GICC Capital Corp. v. Technology Finance Group, Inc., 30 F.3d 289, 290 (2d Cir. 1994), plaintiff accepted a promissory note from defendants as part of an unrelated settlement. During the negotiation of the terms and issuance of the note the defendants did not disclose that, at the same time they were agreeing to cause the corporation to issue the note, they were stripping it of assets, rendering it unable to meet that obligation. Id. at 292-93. The defendants' failure to disclose the stripped-down status of the corporation induced the plaintiff to accept the note in settlement. We stated that because of the timing and magnitude of the note, the plaintiffs had RICO standing. Id. at 293. In other words, if the plaintiffs had accepted a promissory note from a corporation that was at that time able to repay the note, and later the defendants stripped the corporation, the injury would have been indirect because it would have derived wholly from injuries to the corporation. But, when the promissory note was issued, the corporation had already been stripped of enough assets to undermine the possibility of repayment. Thus, because of the defendants' misrepresentations, the plaintiff in GICC (much like the plaintiffs in Cerebelli) accepted an over-valued asset, the note, in exchange for the settlement of their litigation claims. The injury was direct because the plaintiff was immediately injured in the process of negotiating the settlement contract with the defendants, rather than as a derivative result of later injuries to a third party namely, the corporation that issued the note.
 
 
 43
 As these cases demonstrate, the critical question posed by the direct injury test is whether the damages a plaintiff sustains are derivative of an injury to a third party. If so, then the injury is indirect; if not, it is direct.[4]
 
 
 44
 C. Applying the Direct Injury Test to Instant Case
 
 1. Parties' Contentions
 
 45
 The defendants' principal point on appeal is that the plaintiffs' damages are entirely derivative of the harm suffered by individual smokers as a result of defendants' acts. Hence, defendants believe that plaintiffs' alleged injuries are indirect, since they flow from the misfortunes visited upon third persons, and that plaintiffs therefore stand at too remote a distance to recover.
 
 
 46
 In response, plaintiffs declare that their complaint alleges a direct injury brought about by defendants' misconduct towards the Funds themselves. Plaintiffs allege that defendants misrepresented the health risks of smoking and the addictiveness of nicotine, causing the Funds to fail to implement smoking cessation programs, and deliberately shifting the costs of health care for tobacco related illnesses from the tobacco companies to the Funds. In turn, this led to what the district court termed "harm to [plaintiffs'] infrastructure, financial stability, [and] ability to project costs." Laborers Local 17, 7 F. Supp. 2d at 285. Plaintiffs insist that these injuries were direct, since the "activities of the Funds themselves were affected by defendants' misconduct."
 
 
 47
 Ultimately, however, whether plaintiffs' injuries are labeled as "infrastructure harm" or "harm to financial stability," their damages are entirely derivative of the harm suffered by plan participants as a result of using tobacco products. Without injury to the individual smokers, the Funds would not have incurred any increased costs in the form of the payment of benefits, nor would they have experienced the difficulties of cost prediction and control that constituted the crux of their infrastructure harms. Being purely contingent on harm to third parties, these injuries are indirect. Consequently, because defendants' alleged misconduct did not proximately cause the injuries alleged, plaintiffs lack standing to bring RICO claims against defendants.
 
 2. Policy Considerations
 
 48
 Further, this conclusion is consistent with the three policy factors addressed by Holmes, which buttress the principle that plaintiffs with indirect injuries lack standing to sue under RICO. 503 U.S. at 269-70. "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." Id. at 269 (citing AGC, 459 U.S. at 542-43). For instance, in Holmes, it was difficult to tell whether plaintiff's inability to collect from certain brokers had resulted from the defendants' conspiracy to manipulate the brokers or, instead, from the brokers' poor business practices. Id. at 273. The present case is similar because the damage claims here are incredibly speculative. It will be virtually impossible for plaintiffs to prove with any certainty: (1) the effect any smoking cessation programs or incentives would have had on the number of smokers among the plan beneficiaries; (2) the countereffect that the tobacco companies' direct fraud would have had on the smokers, despite the best efforts of the Funds; and (3) other reasons why individual smokers would continue smoking, even after having been informed of the dangers of smoking and having been offered smoking cessation programs. On a fundamental level, these difficulties of proving damages stem from the agency of the individual smokers in deciding whether, and how frequently, to smoke. In this light, the direct injury test can be seen as wisely limiting standing to sue to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties (here, the smokers) from whom the plaintiffs' injuries derive.
 
 
 49
 These concerns become particularly pointed in a case, like the present one, where the injuries are alleged to derive not simply from defendants' affirmative misconduct but also from plaintiffs' fraudulently induced inaction. That is, it is often easier to ascertain the damages that flow from actual, affirmative conduct, than to speculate what damages arose from a party's failure to act. In the latter situation, as in the case at hand, it becomes difficult to distinguish among the multitude of factors that might have affected the damages. Here, for example, plaintiffs' alleged damages might have derived from inefficiencies in the Funds' own management, as well as from non-smoking related health problems suffered by the smokers, and it would be the sheerest sort of speculation to determine how these damages might have been lessened had the Funds adopted the measures defendants allegedly induced them not to adopt.
 
 
 50
 The complexity of these calculations makes the ultimate question of damages suffered by the Funds virtually impossible to determine. Indeed, this case seems to present precisely the type of large, complicated damages claims that Holmes and Associated General Contractors sought to avoid. See, e.g., AGC, 459 U.S. at 545 ("[M]assive and complex damages litigation not only burdens the courts, but also undermines the effectiveness of treble-damages suits."). Moreover, for us to rule otherwise could lead to a potential explosion in the scope of tort liability, which, while perhaps well-intentioned, is a subject best left to the legislature.
 
 
 51
 The second policy factor addressed in Holmes focuses on the possibility that "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." 503 U.S. at 269 (citing AGC, 459 U.S. at 543-44). Under New York law, the smokers are prohibited from recovering medical costs paid to them by insurers. New York law dictates that "where the plaintiff seeks to recover the cost of medical care" and the court finds that such costs were reimbursed by an insurance company, the court "shall reduce the amount of award by such a finding." N.Y. C.P.L.R. §4545(c) (McKinney 1992). As a result, the district court believed the suit presented no risk of multiple recoveries. See Laborers Local 17, 7 F. Supp. 2d at 285.
 
 
 52
 Admittedly, the smokers in this case do not present a risk of double recovery under RICO. At the same time, however, other remote payors like the employers or health insurers with whom the Funds may contract might bring suit claiming that they ultimately bore the costs. Here, the Funds argue that ERISA prevents the employers from obtaining such a recovery. But the provision cited by plaintiffs merely prevents the assets of the Fund from inuring to the benefit of an employer. See 29 U.S.C. §1103(c)(1) (1994). Although this might prevent recovery by an employer against the Fund, it in no way prevents a suit by the employer against the defendants as tortfeasors. Thus, a possibility of duplicative recoveries exists.
 
 
 53
 In this context, defendants assert that New York State has already sued some of the tobacco companies, seeking recovery of costs it has expended for the medical care of its employees, some of whom are participants in certain of the public-sector union Funds. But, the Funds respond, such duplicative recovery is prevented by the single satisfaction rule. The single satisfaction rule is often used to prevent a single plaintiff from recovering its damages several times over from multiple defendants. But, even were we to assume that the single satisfaction rule would prohibit duplicative recoveries by multiple plaintiffs against a single defendant, it would not cure the ultimate problem set forth in Holmes, that is, that courts would be forced to "adopt complicated rules apportioning damages among" the Funds, the employers, and perhaps even the unions, each of which is "removed at [a] different level[] of injury." Holmes, 503 U.S. at 269.
 
 
 54
 In the third policy factor discussed by Holmes, the Supreme Court concluded that the need to grapple with the problems of calculating and apportioning damages was unjustified where "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." Id. (citing AGC, 459 U.S. at 541-42). The Funds correctly note that these RICO causes of action could not be asserted by the smokers or by the Funds in a subrogation action because the RICO statute requires an injury to "business or property," whereas the smokers' injuries are personal in nature. Hence, the Funds conclude there are no more directly injured "private attorneys general" who could vindicate the law for these alleged RICO violations. The district court also found that because individual smokers would not be able to bring a RICO action, the harms alleged in plaintiffs' complaint would go unremedied were the Funds' action not allowed to continue.
 
 
 55
 Yet, to the contrary, our holding that plaintiffs lack standing under RICO need not bring about the result plaintiffs fear. The Funds may still bring a subrogation action to recover the medical costs paid out for the individual smokers, and the smokers themselves have sufficient independent incentive to pursue their own causes of action for such additional types of injuries as pain and suffering. Although these will not be RICO claims, they will remedy the harm done by defendants' alleged misconduct. Moreover, these actions will promote "the general interest in deterring injurious conduct," which Holmes noted as the objective of this policy factor. 503 U.S. at 269. Especially where such other actions are available, the lack of a RICO damages remedy for even direct personal injuries (such as those suffered by the individual smokers) actually weighs heavily against RICO standing for parties (such as the Funds) alleging harms that are purely contingent on personal injuries suffered by others.
 
 
 56
 In sum, the policy considerations highlighted in Holmes support our conclusion that the Funds have failed to establish proximate causation and that, accordingly, they lack standing to sue the defendants under RICO.
 
 
 57
 III Is a Defendant's Specific Intent to Harm a Plaintiff An Exception to the Direct-Injury Rule?
 
 
 58
 Plaintiffs aver that even if their claims fail the direct injury test, they should still have standing to sue because an exception to this rule exists where the defendants specifically intend to harm plaintiffs. The complaint asserts that the tobacco companies intended to injure the Funds. The Funds urge that AGC - a case that discusses the principles of proximate cause in the antitrust context and upon which Holmes heavily relied - quotes a scholarly treatise to this effect, "'[w]here the plaintiff sustains injury from the defendant's conduct to a third person, it is too remote ... unless the wrongful act is willful for that purpose.'" 459 U.S. at 532 n.25 (quoting 1 J.G. Sutherland, A Treatise on the Law of Damages 55-56 (1883)).
 
 
 59
 Yet, contrary to plaintiffs' argument, this view was specifically rejected in AGC. The Court there stated that "although buttressed by an allegation of intent to harm the [plaintiffs]" the complaint was "insufficient as a matter of law" for several reasons, including the fact that the plaintiffs alleged merely indirect injuries and were therefore barred from recovery as lacking proximate cause. 459 U.S. at 545. In addition, the Court observed that the availability of a remedy in that case was "'not a question of the specific intent of the conspirators.'" Id. at 537 (quoting Blue Shield v. McCready, 457 U.S. 465, 479 (1982)). The Ninth Circuit has also interpreted AGC to mean that "[t]he existence of specific intent does not answer the question of whether the injury is specifically direct." Pillsbury, Madison & Sutro v. Lerner, 31 F.3d 924, 929 (9th Cir. 1994). Moreover, that court stated that "nothing in Holmes suggests that allegations of specific intent to cause RICO harm override the necessity to evaluate the directness of injury." Id.
 
 
 60
 In addition, the cases plaintiffs cite to support their argument are not persuasive, either because their discussion of intent is dicta or they involve a direct injury. See Chelsea Moving & Trucking Co. v. Ross Towboat Co., 280 Mass. 282, 286, 182 N.E. 477, 479 (1932) (noting in dicta that malice was not alleged in that case); Crab Orchard Improvement Co. v. Chesapeake & Ohio Ry. Co., 115 F.2d 277, 282-83 (4th Cir. 1940) (suggesting in dicta that an employer may maintain a suit against a tortfeasor who injured an employee, if the tortfeasor intended to harm the employer in his contractual obligations); GICC, 30 F.3d at 292-93 (examining intent, but ultimately involving a direct injury, as discussed above); Manson, 11 F.3d at 1130 (noting that the defendants in Bankers Trust had acted for the "direct purpose" of harming the plaintiffs; however, Bankers Trust involved a direct injury, as discussed above).
 
 
 61
 As such, these decisions regarding specific intent do not support the proposition that an indirect injury is actionable where the injury was specifically intended by the defendant. In other words, an allegation of specific intent does not overcome the requirement that there must be a direct injury to maintain this action.[5]
 
 IV Common Law Fraud and Special Duty Claims
 
 62
 Our inquiry into RICO standing began with the Supreme Court's holding in Holmes that the statute requires that at least the proximate causation principles found generally in the common law, including the direct injury requirement discussed above, be met. These principles also apply in general terms to the fraud and special duty causes of action asserted by plaintiffs under New York common law. See, e.g., Ferguson v. Green Island Contracting Corp., 36 NY2d 742, 743, 368 N.Y.S.2d 163, 163 (1975) (per curiam) (employer may not recover damages it sustains when key employee is injured by third-party tortfeasor); see also Rockaway Blvd. Wrecking & Lumber Corp. v. Raylite Elec. Corp., 26 AD2d 9, 12, 269 N.Y.S.2d 926, 929 (1st Dep't 1966) (per curiam) ("'where a third person suffers damage by reason of a contractual obligation to the injured party, such damage is too remote and indirect to become the subject of a direct action ex delicto, in the absence of subrogation.'" (quoting Forcum-James Co. v. Duke Transp. Co., 231 La. 953, 962, 93 So. 2d 228, 230-31 (1957))); see also Pulka v. Edelman, 40 NY2d 781, 785, 390 N.Y.S.2d 393, 396 (1976) (New York law requires proximate cause in special duty cases). Although New York law appears to permit limited exceptions to the general requirement that the direct injury test be met, see Rockaway, 26 AD2d at 12, plaintiffs have brought no cases to our attention that would permit such a departure from the general rule in the present case. Hence, analogous principles to those that doomed plaintiffs' RICO causes of action also bar plaintiffs' common law fraud and special duty actions.
 
 V Remaining Points
 A. Trust Principles
 
 63
 Plaintiffs assert that the direct injury test is not applicable in this case, because certain of the Funds are trusts governed by ERISA and the Taft-Hartley Act and other Funds are non-ERISA not-for-profit public employee trusts. First, plaintiffs contend that the direct injury test is only a rule of state insurance law, and state insurance law is inapplicable to ERISA funds. See 29 U.S.C. §1144(b)(2)(B) (plan not to be subjected to "any law ... purporting to regulate . . . insurance contracts"). However, as demonstrated by Holmes, AGC, and Kinsman, the proximate cause direct injury requirement is a common law rule of general application, not one simply limited to insurance cases.
 
 
 64
 Second, plaintiffs aver that traditional trust principles apply and displace the direct injury requirement. However, nothing in ERISA supports this argument. Even assuming that trust principles govern, case law suggests that when a Fund brings an action at law for tort against a third person it should be treated like any other plaintiff. See Restatement (Second) of Trusts §280 cmt. a (1959) ("If a third person commits a tort with respect to the trust property, the trustee can maintain such actions at law as he could maintain by reason of his ownership of the property as if he held it free of trust."); IV A.W. Scott, The Law of Trusts §280.1 (1967) (remedies for torts against trust property are the same as if the property were held free of trust). Thus, it follows, that both ERISA and non-ERISA funds, like any plaintiff, would be subject to the requirements of proximate cause and its direct injury inquiry. Moreover, the specific civil remedies set forth in ERISA for redressing violations of that statute or of the provisions of an ERISA plan are simply inapplicable here, since no such violation is at issue in this case. 29 U.S.C. §1132; see also Mertens v. Hewitt Assocs., 508 U.S. 248, 253-54 (1993). Therefore, that the funds are governed by ERISA or general trust principles does not, insofar as plaintiffs' complaint is concerned, change the law of proximate cause.
 
 B. State Entity Cases
 
 65
 Plaintiffs also point to numerous cases that have arisen where States have brought a direct action against the tobacco companies to recover medical costs they expended on smokers, and district courts have upheld their right to sue. But, many of these cases are distinguishable because they involved state statutory provisions that the courts construed as allowing the state to sue directly. See State ex rel. Norton v. R.J. Reynolds Tobacco Co., 1997 CV-003432 (Colo. Dist. Ct. Oct. 2, 1998); State ex rel. Kelley v. Philip Morris, Inc., No. 96-84281-CZ (Mich. Cir. Ct. May 28, 1997); State ex rel. Humphrey v. Philip Morris, Inc., No. C1-94-8565 (Minn. Dist. Ct. Feb. 19, 1998); State v. Philip Morris, Inc., No. S 744-97 CnC (Vt. Super. Ct. Mar. 25, 1998); State v. American Tobacco Co., No. 96-2-15056-8 SEA, 1996 WL 931316 (Wash. Super. Nov. 19, 1996); State ex rel. Bronster v. Brown & Williamson Tobacco Corp., No. 97-0441-01 (Haw. Cir. Ct. Sept. 18, 1998). In addition, in some cases the unique quasi-sovereign rights of a state to sue to protect the health and welfare of their citizens was found to sustain standing. See Texas v. American Tobacco Co., 14 F. Supp. 2d 956, 962-63 (E.D. Tex. 1997). Hence, in general, state cases are often distinguishable on the issue of proximate causation given the state's unique role relative to protection of its citizens, statutes governing Medicaid recoupment, and certain state statutes that permit states to maintain actions on behalf of their citizenry. However, this is not the scenario before us, and we have no reason to pass on it.
 
 CONCLUSION
 
 66
 As both parties acknowledge, we have discretion to consider all aspects of the district court's March 25 order, see Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, 205 (1996), but also have discretion to decline to adjudicate any aspect of the order, including the questions actually certified, see Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 864 (2d Cir. 1996). We answer the first question certified to us in the affirmative, that is, we hold that the economic injuries alleged in plaintiffs' complaint are purely derivative of the physical injuries suffered by plan participants and therefore too remote as a matter of law for them to have standing to sue defendants. In light of that disposition, we need not reach or determine the second certified question, that is, whether the federal Cigarette Labeling and Advertising Act preempts plaintiffs' state common law claims.
 
 
 67
 Accordingly, we hereby reverse the district court's March 25, 1998 order with respect to causes of action I and II (the RICO claims), V (the fraud claim), and VI (the special duty claim). The case is remanded to the district court with directions to dismiss plaintiffs' complaint.
 
 
 
 Notes:
 
 
 [1]
 The ERISA funds and the non-ERISA funds filed separate but substantially similar complaints that the district court considered together as related. For simplicity's sake, except where otherwise noted, when discussing the plaintiffs' allegations in both cases we follow the convention adopted by the district court of referring to the Laborers Local complaint.
 
 
 [2]
 The defendants are: Philip Morris, Inc.; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation, USA; B.A.T. Industries, P.L.C.; Lorillard Tobacco Co.; United States Tobacco Company; The Tobacco Institute, a public relations agent of the tobacco companies; The Council for Tobacco Research; Smokeless Tobacco Council, Inc.; and Hill & Knowlton, Inc., a public relations firm.
 
 
 [3]
 We have previously stated that, in a suit on a statute, it may be preferable to speak not in terms of causation, but rather in terms of whether the plaintiff is within the class the statute sought to protect and whether the harm done was one the statute sought to prevent. See Abrahams v. Young & Rubicam Inc., 79 F.3d 234, 237 (2d Cir. 1996). Nevertheless, we have chosen in this case to use the same "proximate cause" terminology that the Supreme Court employed in Holmes, which involved an aspect of statutory standing that is closely analogous to the issue presented here. To avoid confusion in other cases, we re-emphasize that, depending on the statute, the existence of common-law proximate causation is neither always necessary, nor always sufficient, to meet the requirement of statutory standing. See Abrahams, 79 F.3d at 237 n.3.
 
 
 [4]
 It bears noting again that, as the Supreme Court restated in Holmes, "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." 503 U.S. at 272 n.20. In addition, the term "indirect" may connote concepts - such as remoteness in time or space - other than "derivative," which itself cannot be defined with absolute precision. Accordingly, we follow the lead of the Holmes Court in making clear that, to the extent our description of "indirect" or "derivative" injury might seem to encompass cases where recovery by the plaintiff would not run afoul of the policy concerns set forth above, the outer limits of the direct injury test are described more by those concerns than by any bright-line, verbal definition. See id. ("Thus, our use of the term 'direct' should merely be understood as a reference to the proximate-cause inquiry that is informed by the concerns set out in the text.").
 
 
 [5]
 We do not decide whether the presence of a specific intent to harm a particular plaintiff would weigh in favor of a finding of proximate cause where, unlike here, the existence of directness under the Holmes factors is in doubt.