

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-6-2000

# Allegheny Gen'l Hosp v. Philip Morris Inc

Precedential or Non-Precedential:

Docket 99-4024

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Allegheny Gen'l Hosp v. Philip Morris Inc" (2000). *2000 Decisions.* Paper 213.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/213

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 6, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-4024, 00-3101 and 00-3102

ALLEGHENY GENERAL HOSPITAL; ALLEGHENY VALLEY
HOSPITAL; ARMSTRONG COUNTY MEMORIAL HOSPITAL;
CANONSBURG GENERAL HOSPITAL; CARBON-
SCHUYLKILL COMMUNITY HOSPITAL, INC., d/b/a
MINERS MEMORIAL MEDICAL CENTER;
CHAMBERSBURG HOSPITAL; FORBES REGIONAL
HOSPITAL; HAZLETON--ST. JOSEPH MEDICAL CENTER;
LEHIGH VALLEY HOSPITAL; MUHLENBERG HOSPITAL
CENTER; NORTHEASTERN PENNSYLVANIA
CORPORATION, d/b/a HAZLETON GENERAL HOSPITAL;
SAINT LUKE'S HOSPITAL OF BETHLEHEM; SAINT
LUKE'S -- ALLENTOWN CAMPUS; ST. LUKE'S
QUAKERTOWN HOSPITAL; SAINT VINCENT HEALTH
CENTER; WAYNESBORO HOSPITAL,

v.

PHILIP MORRIS, INC.; R.J. REYNOLDS TOBACCO
COMPANY; BROWN & WILLIAMSON TOBACCO
CORPORATION; B.A.T. INDUSTRIES, PLC; THE
AMERICAN TOBACCO COMPANY, INC., c/o BROWN &
WILLIAMSON TOBACCO CORPORATION; LORILLARD
TOBACCO COMPANY; LIGGETT GROUP, INC.; UNITED
STATES TOBACCO COMPANY; TOBACCO INSTITUTE,
INC.; THE COUNCIL FOR TOBACCO RESEARCH--USA,
INC.; SMOKELESS TOBACCO COUNCIL, INC.; HILL &
KNOWLTON, INC.,

Allegheny General Hospital; Allegheny Valley Hospital;
Armstrong County Memorial Hospital; Canonsburg
General Hospital; Carbon-Schuylkill Community Hospital,
Inc., d/b/a Miners Memorial Medical Center;
Chambersburg Hospital; Forbes Regional Hospital;

Hazleton--St. Joseph Medical Center; Lehigh Valley
Hospital; Muhlenberg Hospital Center; Northeastern
Pennsylvania Corporation, d/b/a Hazleton General
Hospital; Saint Luke's Hospital of Bethlehem; Saint
Luke's--Allentown Campus; St. Luke's Quakertown
Hospital; Saint Vincent Health Center; Waynesboro
Hospital,

     Appellants in 99-4024,

Armstrong County Memorial Hospital; Carbon-Schuylkill
Community Hospital, Inc., d/b/a Miners Memorial
Medical Center; Chambersburg Hospital; Hazleton--St.
Joseph Medical Center; Lehigh Valley Hospital;
Muhlenberg Hospital Center; Northeastern Pennsylvania
Corporation, d/b/a Hazleton General Hospital; Saint
Luke's Hospital of Bethlehem; Saint Luke's-- Allentown
Campus; St. Luke's Quakertown Hospital; Saint Vincent
Health Center; Waynesboro Hospital,

     Appellants in 00-3101,

Allegheny General Hospital; Allegheny Valley Hospital;
Canonsburg General Hospital; Forbes Regional Hospital,

     Appellants in 00-3102.

ON APPEAL FROM THE ORDER OF
THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(D.C. Civ. No: 99-9)
District Court Judge: The Honorable Donetta W. Ambrose

Submitted Under Third Circuit LAR 34.1(a)
July 19, 2000

Before: SLOVITER, NYGAARD, and FUENTES,
Circuit Judges

(Opinion Filed: October 6, 2000)

Terrence J. O'Rourke
Sean O. Sheridan
Melissa L. Staggers
Nash & Company, P.C.
11 Stanwix Street
Suite 700
Pittsburgh, PA 15222

 ATTORNEYS FOR APPELLANTS

Kenneth J. Parsigian,
Christopher D. Moore
Goodwin, Proctor & Hoar, LLP
Exchange Place
Boston, MA 02109

Kevin C. Harkins,
Cohen & Grigsby, P.C.
11 Stanwix Street
15th Floor
Pittsburgh, PA 15222

 ATTORNEYS FOR APPELLEES
PHILIP MORRIS, INC. AND
BROWN & WILLIAMSON
TOBACCO CORPORATION

Scott D. Livingston,
Marcus & Shapira, LLP
301 Grant Street
One Oxford Centre, 35th Floor
Pittsburgh, PA 15219

 ATTORNEY FOR APPELLEE
R.J. TOBACCO COMPANY

Thomas Finarelli
Lavin, Coleman, O'Neil, Ricci,
 Finarelli & Gray
510 Walnut Street
1200 Penn Mutual Towers
Philadelphia, PA 19106

 ATTORNEY FOR APPELLEE
B.A.T. INDUSTRIES P.L.C..

3

Howard M. Klein
William J. O'Brien
Conrad, O'Brien, Gellman &
 Rohn, P.C.
1515 Market Street
16th Floor
Philadelphia, PA

 ATTORNEYS FOR APPELLEES
THE TOBACCO INSTITUTE AND
LORILLARD TOBACCO COMPANY

Stephen J. Imbriglia
Hecker, Brown, Sherry & Johnson
18TH & Arch Streets
1700 Two Logan Square
Philadelphia, PA 19103

 ATTORNEY FOR APPELLEE
UNITED STATES TOBACCO
COMPANY

Patrick W. Kittredge
Kittredge, Donley, Elson, Fullem
 & Embick
421 Chestnut Street
Fifth Floor
Philadelphia, PA 19106

 ATTORNEY FOR APPELLEE
THE COUNCIL FOR TOBACCO
RESEARCH-USA, INC.

4

Wilbur L. Kipnes
Schnader Harrison Segal &
 Lewis, LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103
John K. Gisleson
Schnader, Harrison, Segal &
 Lewis, LLP
120 Fifth Avenue
Fifth Avenue Place, Suite 2700
Pittsburgh, PA 15222

 ATTORNEYS FOR APPELLEE
SMOKELESS TOBACCO COUNCIL,
INC.

Richard L. Kremnick
Blank, Rome, Comiskey &
 McCauley, LLP
One Logan Square
Philadelphia, PA 19103

 ATTORNEY FOR APPELLEE HILL
& KNOWLTON, INC.

J. Kurt Straub
Obermayer, Rebmann, Maxwell
 & Hipple
1617 John F. Kennedy Blvd.
One Penn Center, 19th Floor
Philadelphia, PA 19103

 ATTORNEY FOR APPELLEE
LIGGETT GROUP, INC.

OPINION OF THE COURT

FUENTES, Circuit Judge:

Sixteen Pennsylvania hospitals brought this suit against various tobacco companies and their trade associations, seeking to recover unreimbursed costs of health care provided to nonpaying patients suffering from tobacco-

5

related disease. The hospitals alleged that the tobacco companies engaged in a conspiracy lasting more than 40 years to manipulate the nicotine content in cigarettes and other tobacco products. They alleged that the tobacco companies deceived and misled the public about the addictive properties of nicotine and the health risks of smoking. As a result, many people used tobacco and developed lung cancer and other tobacco-related illnesses. The hospitals expended significant resources treating these tobacco users, and now seek recovery of their expenses under federal antitrust and RICO provisions, as well as state common law theories.

In Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 917-18 (3d Cir. 1999), cert. denied, 120 S. Ct. 844 (2000) [hereinafter Steamfitters], this Circuit affirmed the dismissal of similar claims brought by union health and welfare funds, reasoning that the funds' injuries were too remote from, and not proximately caused by, the tobacco companies' alleged wrongdoing. Relying on Steamfitters, the District Court dismissed the hospitals' claims. The hospitals appeal. We hold that because the hospitals' damages are too speculative and their injuries are too remote from the tobacco companies' alleged wrongdoing, proximate cause is lacking, and thus the hospitals do not have standing to sue. We therefore affirm.

I. Factual Background and Procedural History

The appellants are sixteen charitable not-for-profit Pennsylvania hospitals (the "Hospitals"). 1 They are licensed under the Pennsylvania Health Care Facilities Act, 35 Pa. Cons. Stat. SS 448.101-448.904b, and are required by

_____

1. The Hospitals are: (1) Allegheny General Hospital; (2) Allegheny Valley Hospital; (3) Armstrong County Memorial Hospital; (4) Canonsburg General Hospital; (5) Carbon-Schuylkill Community Hospital, Inc. d/b/a Miners Memorial Medical Center; (6) Chambersburg Hospital; (7) Forbes Regional Hospital; (8) Hazleton -- St. Joseph Medical Center; (9) Lehigh Valley Hospital; (10) Muhlenberg Hospital Center; (11) Northeastern Pennsylvania Corporation d/b/a Hazleton General Hospital; (12) Saint Luke's Hospital of Bethlehem; (13) St. Luke's -- Allentown Campus; (14) St. Luke's Quakertown Hospital; (15) Saint Vincent Health; and (16) Waynesboro Hospital.

6

Pennsylvania law to provide health care to Medicaid, medically indigent, and nonpaying patients (collectively "nonpaying patients"), see 35 Pa. Cons. Stat. S 449.8(a). The Commonwealth of Pennsylvania does not fully reimburse the Hospitals for health care provided to these patients. The Hospitals therefore bear the financial burden of their care. The defendants are various producers of tobacco products and their trade associations (the"Tobacco Companies").2

The Hospitals allege that, over a 40 year period, the Tobacco Companies conspired to conceal from the public the medical risks and addictive nature of tobacco and to limit information that might reduce the sales of tobacco products. This effort involved the suppression of scientific research on safer tobacco products and on methods of reducing individual consumption. It also involved false affirmative representations of tobacco use as a safe or even beneficial activity. The Hospitals allege that, as a result of this conspiracy, millions of Americans smoked, chewed, and snuffed tobacco. Many developed lung cancer, oral cancer, heart disease, and a host of other serious afflictions. Some tobacco users had health insurance or the resources to pay for treatment. But others, for whatever reason, were medically indigent and could not afford health care -- i.e., the nonpaying patients.

The Tobacco Companies allegedly knew that the burden of treating these patients would fall on direct health care providers, such as the Hospitals. In fact, the Hospitals claim that from the inception of the conspiracy, the Tobacco Companies intended to shift to the Hospitals the cost of diagnosing and treating tobacco-related diseases suffered by nonpaying patients. They do not claim that the Tobacco Companies are legally liable to the tobacco users

_____

2. The Tobacco Companies are: (1) Philip Morris, Inc.; (2) R.J. Reynolds Tobacco Company; (3) Brown & Williamson Tobacco Corporation; (4) B.A.T. Industries, P.L.C.; (5) The American Tobacco Company, Inc. c/o Brown & Williamson Tobacco Corporation; (6) Lorillard Tobacco Company; (7) The Ligget Group, Inc.; (8) United States Tobacco Company; (9) The Tobacco Institute, Inc.; (10) The Council for Tobacco Research -- U.S.A., Inc.; (11) Smokeless Tobacco Council, Inc.; and (12) Hill & Knowlton, Inc.

themselves. Rather, the Tobacco Companies are allegedly liable to the Hospitals for the Hospitals' unreimbursed expenses, which reportedly amounted to millions of dollars each year.

The Hospitals' allegations encompass two theories-- an indirect injury theory and a direct injury theory. 3 Under the indirect injury theory, the Hospitals allege that, through deception, the Tobacco Companies caused nonpaying patients to smoke, inducing significant tobacco-related diseases. The law required the Hospitals to provide treatment to these patients regardless of their ability to pay for it. The Hospitals therefore reason that the Tobacco Companies' wrongful acts increased the unreimbursed costs the Hospitals incurred.

Under the direct injury theory, the Hospitals allege that the Tobacco Companies' conspiracy to conceal information about the risks of tobacco, and to prevent the development of safer cigarettes and alternative nicotine delivery devices, hampered the Hospitals' efforts to reduce tobacco consumption among nonpaying patients. In other words, if the Tobacco Companies had not conspired, the Hospitals could have more effectively counseled patients to quit smoking or use safer products, reducing the health care costs of treating tobacco-related disease.

The Hospitals seek recovery under various legal theories, including claims under federal antitrust laws, 15 U.S.C. SS 1-37a, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. S 1962, and state common law claims for fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation and omission, breach of special duty, public nuisance, aiding and abetting, indemnity based on intentional conduct, restitution, unjust enrichment, quantum meruit, and civil conspiracy. In response, all but two of the Tobacco Companies filed a Rule 12(b)(6) motion in the District Court to dismiss the complaint for failure to state a claim upon which relief may be granted. The District Court granted the motion, holding that the Hospitals' federal antitrust and

_____

3. We import this useful terminology from Chief Judge Becker's discussion in Steamfitters, 171 F.3d at 919-20.

RICO claims were based on remote and indirect injuries and on an attenuated theory of causation, and that therefore the Hospitals lacked standing to bring those claims. The District Court also found no merit in the remaining state common law claims, dismissing them on a variety of rationales.

The Hospitals filed a notice of appeal. Thereafter, the parties stipulated that the remaining two Tobacco Companies, B.A.T. Industries, P.L.C., and Smokeless Tobacco Council, Inc., had joined in the motion to dismiss. This stipulation rendered the District Court's orderfinal and appealable as to all the Tobacco Companies. We therefore have jurisdiction under 28 U.S.C. S 1291. See Fassett v. Delta Kappa Epsilon (N.Y.), 807 F.2d 1150, 1155 (3d Cir. 1986) (actual finality cures an earlier jurisdictional defect); Pireno v. New York State Chiropractic Ass'n, 650 F.2d 387, 389 n.4 (2d Cir. 1981), aff 'd sub nom. Union Labor Life Ins. Co. v. Pireno, 458 U.S. 119 (1982) (later stipulation of dismissal as to a remaining defendant rendered earlier order final and appealable).

We exercise plenary review over the District Court's Rule 12(b)(6) dismissal. See Steamfitters, 171 F.3d at 919. In judging that dismissal, we take all the Hospitals' factual allegations as true, and affirm only if "it is certain that no relief can be granted under any set of facts which could be proved." See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 262 n.12 (3d Cir. 1998) (internal quotations and citations omitted); see also Fed. R. Civ. P. 12(b)(6).

II. Federal Claims – Antitrust and RICO Claims

This case presents an issue of first impression in this Circuit: whether hospitals, with a legal duty to provide unreimbursed medical care to nonpaying patients suffering from tobacco-related disease, have standing to assert antitrust and RICO claims against tobacco companies. Apart from the Court below, we have found only one district court that has directly considered the issue. See Association of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc. , 79 F. Supp. 2d 1219 (W.D. Wash. 1999) (dismissing the claims).

Our analysis of the Hospitals' claims nevertheless draws guidance from the closely analogous Steamfitters decision,

where a group of union health and welfare funds, who paid for tobacco-related health care for their members, brought suit against tobacco companies. In Steamfitters, this Court affirmed the dismissal of those union funds' various antitrust and RICO claims on the grounds that the union funds' injuries were too remote, the injuries were not a necessary step to the success of the tobacco companies' alleged conspiracy, and the damage claims were too speculative and difficult to prove. See 171 F.3d 912. The result in Steamfitters is consistent with all the Courts of Appeals (as well as numerous district courts) that have considered whether health and welfare funds may bring such claims. See Lyons v. Philip Morris Inc., No. 99-2843, 2000 WL 1234272 (8th Cir. Sept. 1, 2000); United Food and Commercial Workers Unions, Employers Health and Welfare Fund, No. 99-13476, 2000 WL 1190787 (11th Cir. Aug. 22, 2000); Texas Carpenters Health Benefit Fund v. Philip Morris, Inc., 199 F.3d 788 (5th Cir. 2000); Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc., 191 F.3d 229 (2d Cir. 1999), cert. denied, 120 S. Ct. 799 (2000); Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d 957 (9th Cir. 1999), cert. denied, 120 S. Ct. 789 (2000); International Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc., 196 F.3d 818 (7th Cir. 1999). We have found only two district court decisions that have decided otherwise. See Service Employees Int'l Union Health and Welfare Fund v. Philip Morris Inc., 83 F. Supp. 2d 70 (D.D.C. 1999); Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris Inc., 36 F. Supp. 2d 560 (E.D.N.Y. 1999), as amended sub nom. National Asbestos Workers Med. Fund v. Philip Morris Inc., 74 F. Supp. 2d 221 (E.D.N.Y. 1999) [hereinafter Blue Cross/Nat'l Asbestos Workers Medical Fund].

Steamfitters provides an analytic framework for health care industry suits against tobacco companies. The key to the analysis is that the Hospitals must have standing to assert federal antitrust and RICO claims, or those claims will be dismissed. See Steamfitters, 171 F.3d at 921 (citing Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992) (standing for RICO claims) and Blue Shield v. McCready, 457 U.S. 465, 477 (1982) (standing for antitrust claims)). Whether the Hospitals have standing depends on

10

whether the Tobacco Companies' alleged conspiracy proximately caused the Hospitals' injuries. Proximate cause, in turn, depends on, and is intertwined with, the remoteness of those injuries. See Steamfitters , 171 F.3d at 921 ("Remoteness is an aspect of the proximate cause analysis, in that an injury that is too remote from its causal agent fails to satisfy tort law's proximate cause requirement . . .").

The Hospitals raise antitrust and RICO claims that are essentially identical to those the union funds raised in Steamfitters. Therefore, Steamfitters controls and requires dismissal unless there is some relevant difference between the alleged injuries that the Hospitals suffered here and the alleged injuries that the union funds suffered in Steamfitters. The Hospitals allege numerous differences, but we only see three substantive ones.4 The union funds in Steamfitters were entities financed through member dues or fees that voluntarily paid health care providers to treat their members. By contrast, the Hospitals in this case (1) have a legal duty to provide medical care to nonpaying patients, (2) directly provide medical care, rather than paying another health care entity to provide it, and (3) provide care without reimbursement. We now turn to the import of these differences.

A. Standing as Quasi-Governmental Entities

Emphasizing their legal duty to provide health care, the Hospitals first argue that, unlike the union funds in Steamfitters, they have "quasi-governmental" standing. They assert that the State of Pennsylvania, through the creation of a legal duty to provide care and through a myriad of licensing and medical statutes, delegated to the Hospitals the traditional public function of providing health care to those without means. According to the Hospitals, this delegated power entails a quasi-governmental right --

_____

4. For example, the Hospitals argue that the Tobacco Companies specifically intended to harm them, and that the Hospitals are not traditional insurers with subrogation rights. Despite the Hospitals' statements to the contrary, the union funds raised these same points in Steamfitters. See id. at 921 n.4 (discussing subrogation), 925-26 (discussing specific intent to harm).

11

as found in state governments -- to sue Tobacco Companies on behalf of nonpaying patients without regard to proximate cause. In response, the Tobacco Companies argue that the Hospitals, as private entities, lack the prerequisites of such standing -- i.e., either an authorizing statute or government status. We agree with the Tobacco Companies.

State governments have standing to sue tobacco companies for damages suffered when paying for smoking-related illnesses, without regard to proximate cause. See Laborers Local 17 Health and Benefit Fund, 191 F.3d at 243-44. This standing may proceed from two sources: (1) a statutory provision that grants an entity the right to sue, see Steamfitters, 171 F.3d at 934 n.18; see also Laborers Local 17 Health and Benefit Fund, 191 F.3d at 243 (listing numerous examples); or (2) a government's "political power" and "threat of legislative action" combined with its parens patriae right to protect the health and welfare of its citizens, see Steamfitters, 171 F.3d at 934 n.18; see also Texas v. American Tobacco Co., 14 F. Supp. 2d 956, 962-63 (E.D. Tex. 1997).

The Hospitals cannot call on either of these sources. They do not act under a statutory provision allowing them to sue. Nor are they a state government entity, possessing political power or the threat of legislative action sufficient to invoke parens patriae authority. Therefore, they do not have quasi-governmental standing, and they must show proximate cause.

The Hospitals attempt to skirt this obvious conclusion by citing Blue Cross/Nat'l Asbestos Workers Medical Fund for the proposition that nonprofit medical providers occupy a parens patriae relationship with their covered populations, therefore entitling those providers to quasi-governmental standing. See 36 F. Supp. 2d at 581. The language the Hospitals cite, however, does not refer to quasi-governmental standing; rather, it simply makes a policy point about the important societal role of nonprofit medical providers. That the District Court in Blue Cross/Nat'l Asbestos Workers Medical Fund still required a showing of proximate cause by the plaintiffs undercuts the Hospitals'

12

argument. See id. at 573.5 A parens patriae suit, by
definition, involves the government as the real party in
interest. See Black's Law Dictionary 1137 (7th ed. 1999)
(parens patriae is "[a] doctrine by which a government has
standing to prosecute a lawsuit on behalf of a citizen")
(emphasis added); see also Alfred L. Snapp & Son, Inc. v.
Puerto Rico, 458 U.S. 592, 607 (1982) ("[i]n order to
maintain a [parens patriae] action . . . the State must be
more than a nominal party"); Hawaii v. Standard Oil Co. of
Cal., 405 U.S. 251, 258-59 (1972) ("the right of a State to
sue as parens patriae"). Though the Hospitals undoubtedly
have an important role in today's society, their status does
not remotely approach that of a government. Having
rejected quasi-governmental standing, we proceed to
proximate cause.

B. The Steamfitters Analysis

    1. Antitrust Claims

Proximate cause is a requirement for antitrust claims
because "[i]t is reasonable to assume that Congress did not
intend to allow every person tangentially affected by an
antitrust violation to maintain an action to recover threefold
damages for the injury to his business or property."
McCready, 457 U.S. at 477. Determinations of proximate
cause depend largely on a case-by-case factor analysis,
rather than on a bright-line rule. See Steamfitters, 171 F.3d
at 922 (stating that Supreme Court cases repeatedly note
that " `proximate cause is hardly a rigorous analytic tool' ")
(quoting McCready, 457 U.S. at 477 n.13).

Steamfitters used two Supreme Court cases, McCready
and Associated Gen. Contractors, Inc., v. California State
Council of Carpenters, 495 U.S. 519 (1983) [hereinafter
AGC], as paradigms for evaluating antitrust claims in the
tobacco context. See 171 F.3d at 922. McCready allows a
proximate cause finding where injured plaintiffs are an
essential and necessary part of an alleged antitrust
conspiracy. AGC, the more recent case, provides a general

_____

5. As explained later, the proximate cause reasoning of Blue Cross/Nat'l
Asbestos Workers Medical Fund is questionable in light of prevailing
Second Circuit doctrine.

13

analysis for the determination of proximate cause through an evaluation of six factors. The Hospitals cannot show that the Tobacco Companies' alleged conspiracy proximately caused their injuries under either McCready or AGC. They therefore lack standing to assert their antitrust claims.

### a. The McCready Analysis

In McCready, Blue Shield subscribers sued Blue Shield for antitrust violations, alleging that Blue Shield had conspired with psychiatrists to push psychologists out of the psychotherapy market by only reimbursing subscribers for psychiatrist-provided psychotherapy. See 457 U.S. at 467. In analyzing proximate cause, the McCready Court "look[ed] (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy" under the antitrust laws. Id. at 478. McCready held that the Blue Shield conspiracy proximately caused the subscribers' injury because the injury was integral to the conspiracy and therefore within Congressional antitrust concern:

> [d]enying reimbursement to subscribers for the cost of treatment was the very means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to . . . [the class of subscribers] . . . was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely the type of loss that the claimed violations . . . would be likely to cause.

Id. at 479 (emphasis added) (quotations and citations omitted). Therefore, the subscribers had standing to sue.

Steamfitters followed the reasoning in McCready. It first noted that the tobacco companies had "ample reason to engage in a conspiracy to prevent safer tobacco products from coming on the market, regardless of the relationship between the Funds and smokers." 171 F.3d at 923. Thus,

14

the union funds' injuries were not the "means" by which the Tobacco Companies achieved their alleged conspiracy; nor were the union funds' injuries "necessary" or "integral" to the alleged conspiracy.6 See id. The union funds were merely ancillary victims of ripple effects from the conspiracy; they did not fall within congressional concern, and therefore proximate cause and antitrust standing did not exist.

Applying this test here, we ask whether "the[T]obacco [C]ompanies could have achieved their alleged aims without the existence of the [Hospitals] or the relationship between the [Hospitals] and [nonpaying patients]." Id. at 923. The Hospitals say no, arguing that, unlike the union funds, they have a duty to provide medical treatment directly to smokers unable to afford treatment. Unlike the union fund members, the nonpaying patients could not have obtained health care outside the Hospitals; that is, without the Hospitals, the nonpaying patients would have died more quickly from tobacco-related disease. By keeping them alive, the Hospitals were defrauded by the Tobacco Companies into maintaining a ready supply of tobacco users.

Heinous as this seems, it does not fall within McCready. As in Steamfitters, the very existence of smokers would have given the Tobacco Companies more than sufficient reason to engage in a conspiracy to suppress information, safer tobacco products, and research, regardless of the existence of the Hospitals. See 173 F.3d at 923. If the allegations are true, then the Hospitals may have made the conspiracy "more profitable or allowed it to exist longer," but that fact alone is insufficient. See id. at 923. Since the Hospitals were not "a necessary step in effecting the ends of the alleged illegal conspiracy," proximate cause and standing for the Hospitals' antitrust claims do not exist under McCready. 457 U.S. at 479.

_____

6. The Hospitals claim that the plaintiffs in Steamfitters did not allege that they were integral to the tobacco companies' conspiracy. This is not correct. See id., 171 F.3d at 922-23 (union funds alleged that their payments were necessary to and the very means of effecting the conspiracy).

15

b. The AGC Analysis

Finding no proximate cause under McCready, we look next to AGC. See Steamfitters, 171 F.3d at 927. In AGC, a labor union sued a contractor's association, alleging that the association conspired to restrain union activities by coercing third parties and association members into entering contracts with nonunion contractors. In holding that the union lacked standing to bring antitrust claims, AGC outlined six factors for determining proximate cause and standing:

> (1) the casual connection between defendant's wrongdoing and plaintiff 's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff 's alleged injury (and whether it relates to the purposes of the antitrust laws, i.e., ensuring competition within economic markets); (4) "the directness or indirectness of the asserted injury"; (5) whether the "damages claim is . . . highly speculative"; and (6) "keeping the scope of complex antitrust trials within judicially manageable limits," i.e., "avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

Steamfitters, 171 F.3d at 924 (quoting AGC, 459 U.S. at 537–38, 540, 542–44).

Steamfitters applied these factors to the union funds' antitrust claims, and found that, while the funds satisfied factors one through three, the indirectness of the funds' injuries and their highly speculative damage claims, subsumed under the principle of remoteness, overwhelmingly showed the lack of proximate cause. Here, the District Court used the same analysis, and held that the alleged conspiracy did not proximately cause the Hospitals' injuries. The Hospitals argue that the District Court misapplied Steamfitters. The Tobacco Companies disagree. We now evaluate these arguments through an independent examination of the AGC factors.

(1) Factor 1: Causal Connection

There is a causal connection between the Tobacco Companies' alleged conspiracy and the Hospitals' injuries

16

-- i.e., but-for that alleged conspiracy, the injuries would not have arisen. This supports a finding of proximate cause. Yet, while a causal connection is necessary for a finding of proximate cause, it is not sufficient by itself. See Steamfitters, 171 F.3d at 925.

### (2) Factor 2: Specific Intent to Harm

The Hospitals allege that the Tobacco Companies specifically intended to shift the costs of the nonpaying patients' tobacco-related illnesses to the Hospitals. Citing the Restatement of Torts and a well-known treatise, [7] the Hospitals argue that specific intent to harm creates proximate cause as a matter of law. Yet, as AGC and Steamfitters clearly state, the invocation of specific intent to harm does not automatically create standing. See AGC, 459 U.S. at 537 (specific intent to harm "is not a panacea that will enable any complaint to withstand a motion to dismiss"); Steamfitters, 171 F.3d at 925 ("we do not find [the intent to harm] dispositive on the issue of antitrust standing"). Intent is simply another factor supporting a finding of proximate cause.

### (3) Factor 3: The Nature of the Hospitals' Injury

This factor asks whether the Hospitals' injuries fall within the scope of congressional antitrust concerns, and specifically, the maintenance of economic competition. See AGC, 459 U.S. at 538-39; see also United States v. Topco Assocs., Inc., 405 U.S. 596, 610 (1972) ("Antitrust laws . . . are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to .. . fundamental personal freedoms."). The intent of the antitrust laws covers injuries to "consumers forced to pay higher prices for tobacco products or competitors harmed by [the Tobacco Companies'] ability to conceal the unsafe nature of their products." Steamfitters, 171 F.3d at 927. The District Court found that the Hospitals' injuries, however alleged, involved indirect costs from treating

---

7. F. Harper, F. James, O. Gray, The Law of Torts S 6.1, at 270 (2d ed. 1986) ("all intended consequences are legal or proximate").

17

nonpaying patients, costs not incurred as a consumer or a competitor. Thus, the injuries did not fall within congressional antitrust concern.

The Hospitals vigorously disagree. First, they argue that construing this factor against their claims effectively insulates the Tobacco Companies from private enforcement actions. This objection is misplaced. " `Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.' " AGC, 459 U.S. at 534 (quoting Hawaii v. Standard Oil Co, 405 U.S. 251, 263 n. 14 (1972)).

Next the Hospitals argue that the District Court erred in finding that their claims, alleged as consumers in the market for safe cigarettes and for information related to the effects of tobacco, were not the type intended to be remedied by the antitrust laws. Like the union funds in Steamfitters, the Hospitals have an indirect and a direct injury theory. See Steamfitters, 171 F.3d at 919–20. The indirect theory encompasses the Hospitals' higher health care costs from the increased smoking of nonpaying patients deceived and misled by the Tobacco Companies. In Steamfitters, the Court found that the union funds' similar indirect theory did not allege an injury in the capacity of a consumer or competitor. See id. at 926–27. Citing Steamfitters, the District Court correctly found that the Hospitals' indirect theory claims are not of the proper type. The Hospitals "are simply some of the many groups or individuals suffering the financial or medical repercussions of the decades-long marketing of a product that we now know is demonstrably unsafe." Id. at 927.

The Hospitals' direct injury theory includes allegations, however, that the Hospitals were consumers of information and alternative nicotine delivery devices, and that the Tobacco Companies' suppression of this market prevented the Hospitals from successfully counseling nonpaying patients to stop smoking or to use safer cigarettes. This suppression allegedly prevented the Hospitals from reducing health care costs. These injuries, alleged by the Hospitals as consumers, "may be of the appropriate type" to be remedied by antitrust laws. See id. at 927 (considering the same theory offered by the union funds). The District

18

Court therefore incorrectly concluded that claims under the direct injury theory are not within congressional intent. Yet, this error is inconsequential since the next two factors -- the remoteness of the injury and the speculativeness of damages -- overwhelm any finding that the direct injury claims may be within congressional antitrust concern.

### (4) Factor 4: Directness/Indirectness of the Injury

The directness or indirectness of the injury involves two inquiries: (1) the appropriate party, and (2) remoteness. See Steamfitters, 171 F.3d at 927. As to the appropriate party, Steamfitters stated:

> [s]ubsumed in the "directness" factor is also the issue of whether other, more directly injured parties could vindicate the policies underlying the antitrust laws: "The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public Iinterest . . . diminishes the justification for allowing a more remote party such as the Union to perform the office of private attorney general."

Id. at 927 (quoting AGC, 459 U.S. at 542). The nonpaying patients in the present case, while more directly injured, may be unwilling to sue the Tobacco Companies for antitrust violations. Moreover, the direct injury theory covers some damages that only Hospitals could have sustained.8 Thus, the District Court correctly determined that the Hospitals seem like the appropriate party.

However, following Steamfitters, the District Court found that the Hospitals' injuries were too remote and the chain of causation too attenuated to satisfy the directness of injury factor. It found that the injuries were indirect and derivative of nonpaying patients' smoking injuries,

_____

8. The Tobacco Companies note the possibility that nonpaying patients may bring antitrust suits for increased medical expenditures, given Pennsylvania's collateral source rule, which allows a patient to recover for health costs, even if the patient did not pay those costs. We discuss this contention later, eventually declining to resolve the issue since we do not rely on the Tobacco Companies' invocation of the collateral source rule to support our holding. See Steamfitters , 171 F.3d at 928 n.9.

19

overshadowing the possibility that the Hospitals might be the appropriate party.

The Hospitals first argue that an intentional injury cannot be indirect. But, as discussed earlier, specific intent to harm does not magically create standing or cause alleged antitrust injuries to be direct. See AGC, 459 U.S. at 537. The Hospitals also argue that their injuries are independent and separate from injuries to nonpaying patients, and in support, list numerous examples. However, we rejected a nearly identical claim in Steamfitters, with language directly applicable to the present case:

> [u]nder plaintiffs' direct theory, the tobacco companies' conduct aimed at the [Hospitals] induced the [Hospitals] to not take certain actions, which led to a greater incidence of smoking (and of smokers using more dangerous products), which led to more illness, which led to increased health care expenditures being borne by the plaintiffs. Although the alleged wrongdoing was more directly aimed at the [Hospitals], the injury itself certainly was no more direct than the indirect injury that arose from the defendant's actions toward smokers. . . . [P]laintiff 's direct-injury claim is that the tobacco companies fraudulently induced the [Hospitals] to not spend money (on safer-smoking or smoking-cessation products) that, if spent, would have diminished a separate revenue stream (i.e., smokers' purchase of tobacco products) for the defendants. We view this as an indirect connection.

171 F.3d at 927-28. Of course, the Hospitals are different from the union funds in Steamfitters in that they provide free medical care, provide it directly, and have a duty to provide it. Yet only the direct provision of care is relevant to remoteness. Moreover, direct provision does not alter the fact that the Hospitals dealt solely with the nonpaying patients, and not with the Tobacco Companies. Cf. International Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund, 196 F.3d at 827 (rejecting the direct payment argument). The Hospitals' injuries are still derivative of the nonpaying patients' injuries. As in Steamfitters, the Hospitals' injuries are too remotely connected in the causal chain from wrongdoing on the part

20

of the Tobacco Companies; thus, the Hospitals' injuries do not satisfy the directness of injury factor. See Steamfitters, 171 F.3d at 927-28.

(5) Factor 5: Highly Speculative Damages

Faced with similar theories based on increased medical costs, Steamfitters held that the union funds' alleged damages were highly speculative and difficult to measure. See 171 F.3d at 928-29. The District Court found the same true of the Hospitals' antitrust claims.

We agree with the District Court that the Hospitals' alleged damages are speculative and uncertain. To quote Steamfitters:

> [i]n order to calculate damages -- i.e., the costs not lowered due to the antitrust conspiracy -- the [Hospitals] must demonstrate how many smokers would have stopped smoking if provided with smoking-cessation information, how many would have begun smoking less dangerous products, how much healthier these smokers would have been if they had taken these actions, and the savings the [Hospitals] would have realized by paying out fewer claims for smoking-related illnesses.

Id. at 929. All these speculative calculations create a vast uncertainty about the Hospitals' damages, and leads us to question whether a remediable injury exists.

The Hospitals argue that they can calculate damages through aggregation and statistical modeling.9 The union funds in Steamfitters made a similar argument, and it was rejected. See id. at 929 ("we do not believe that aggregation

_____

9. Aggregation and statistical modeling are methods of estimating the characteristics of an entire population by looking at a sample of that population. While the Hospitals offer few specifics, we believe that they contemplate sampling a group of nonpaying patients, examining the incidence of tobacco use and the average health care costs among that sample, and then extrapolating the results of that sample to the entire population of nonpaying patients. See generally Michael J. Saks & Peter David Blanck, Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts, 44 Stan. L. Rev. 815 (1992).

21

and statistical modeling are sufficient to get the[plaintiffs] over the hurdle of the AGC factor focusing on whether the `damages claim is . . . highly speculative' ") (quoting AGC, 459 U.S. at 542). Both the union funds in Steamfitters and the Hospitals here have access to the same information base from which to calculate damages. In both contexts, that calculation is highly speculative.

Lastly, the Hospitals argue that difficulty in proving damages should not prevent the Court from remedying an injury, especially where statistical and aggregate evidence is well-accepted by courts to show damages and liability. Again, Steamfitters responds directly to this point when it notes that sometimes:

> [a]ggregation and statistical modeling may be appropriate (though we need not decide that issue here) to allow plaintiffs to overcome the difficulty of proving the amount of damages. . . . In the present context, however, a finding of antitrust standing must precede a finding of liability, which itself precedes an assessment of damages.

Id. at 929 (citations omitted). Similarly, in this case standing must be determined first.

### (6) Factor 6: Avoiding Trial Complexity

The final factor is whether the claim is judicially manageable in terms of avoiding duplicate recoveries and complex apportionment. The District Court found that this case did not present significant problems of duplicate recoveries or complex apportionment, but acknowledged that some apportionment might be required if smokers brought their own claims against the Tobacco Companies. The Hospitals generally agree. They further add that their injuries -- i.e., the costs of providing free health care -- are fundamentally different than the nonpaying patients' injuries -- i.e., the health damages from smoking and the out-of-pocket costs of paying for health care. Thus, the risk of duplicate damage claims is extremely limited. The Tobacco Companies counter that, under Pennsylvania's collateral source rule, nonpaying patients could sue to recover the costs of their medical treatment even if they did

22

not pay for that treatment. Thus, they argue that duplicate recoveries and apportionment are a real concern.

The collateral source rule provides that payments from a third-party to a victim will not lower the damages that the victim may recover from a wrongdoer. This rule prevents the wrongdoer from benefitting from the third-party's payments. See Johnson v. Beane, 664 A.2d 96, 100 (Pa. 1995). The application of this rule to a situation where the wrongdoer pays the victim's damages indirectly through a third-party suit is unclear. Steamfitters declined to predict how Pennsylvania courts would rule on this issue, since it did not rely on the invocation of the rule to support its holding. See 171 F.3d at 928 n.9. We follow a similar route. Since this is an issue of state law, and since the indirectness of injury and the speculativeness of damages factors already militate so strongly against a finding of proximate cause, we choose not to address the application of the collateral source rule. Thus, we assume the District Court was correct in finding little risk of duplicate recoveries and complex apportionment.

* * *

The Hospitals' claims satisfy the first three factors. There is a causal connection, the Hospitals allege the Tobacco Companies harbored specific intent to harm, and, at least for the direct injury theory, the Hospitals' injuries are within congressional antitrust concerns. However, these three factors are outweighed, as they were in Steamfitters, by the sheer remoteness of the Hospitals' injuries from the alleged conspiracy. That remoteness is evident in the highly speculative nature of the Hospitals' damages claims. This deficiency is also manifested in the indirectness of the Hospitals' injuries:

> [t]he sheer number of links in the chain of causation that connect the defendants' suppression of information on the dangers of their products and withholding of safer tobacco products from the market to the [Hospitals'] increased expenditures[are simply too great]. . . . The tortured path that one must follow from the tobacco companies' alleged wrongdoing to the [Hospitals'] increased expenditures demonstrates that

23

the plaintiffs' claims are precisely the type of indirect
claims that the proximate cause requirement is
intended to weed out.

Steamfitters, 171 F.3d at 930. The three distinctions the
Hospitals offer -- direct provision of health care, free
provision of health care, and a duty to provide health care
-- are not significant enough to change the analysis.
Steamfitters controls: proximate cause is lacking, and the
Hospitals lack standing to assert their antitrust claims.

    2. RICO Claims

Standing to assert RICO claims requires that the alleged
RICO violation proximately caused a plaintiff 's injury --
i.e., the violation is not too remote from the injury. See
Holmes v. Securities Investor Protection Corp., 503 U.S. 258,
268 (1992). The principles underlying proximate cause in
RICO are analogous to those in antitrust, and thus much
of the previous discussion about antitrust applies here. See
Steamfitters, 171 F.3d at 932; but see Callahan v. A.E.V.,
Inc., 182 F.3d 237, 263 n.18 (3d Cir. 1999) (where the
factual underpinning of an antitrust claim and a RICO
claim are different, the importation of antitrust proximate
cause analysis may be inappropriate).

The formal factors of proximate cause in RICO are,
however, slightly different. The three factors are: (1) the
directness of the injury -- "the more indirect the injury, `the
more difficult it becomes to ascertain the amount of a
plaintiff 's damages attributable to [defendant's
wrongdoing], as distinct from other, independent, factors;' "
(2) the difficulty of apportioning damages among potential
plaintiffs -- "allowing recovery by indirectly injured parties
would require complicated rules for apportioning damages;"
and, (3) the possibility of other plaintiffs vindicating the
goals of RICO -- "direct victims could generally be counted
on to vindicate the policies underlying" RICO in a better
manner than indirect victims. Steamfitters, 171 F.3d at 932
(quoting Holmes, 503 U.S. at 268-69). Steamfitters drew on
its antitrust analysis in finding that the union funds' RICO
claims were too remote for proximate cause or standing.
See id. at 933-34. The District Court applied the same

24

principles to the Hospitals' RICO claims and reached the same conclusion. The Hospitals argue that the District Court erred.

Again, there are three differences between the union funds' claims and the Hospitals' claims -- the direct provision of medical care, the free provision of medical care, and the duty to provide medical care. We believe that none of these differences are significant enough to change the RICO standing analysis; therefore the result in Steamfitters governs.

### a. The Directness of the Injury

This factor addresses the difficulty of ascertaining damages traceable to the Tobacco Companies' conduct. As we noted in discussing the antitrust claims, the Hospitals' injuries are remote and indirect, and there is much uncertainty and speculation about what would have happened to the Hospitals had the Tobacco Companies not conspired. See Laborers Local 17 Health and Benefit Fund, 191 F.3d at 240 ("sheerest sort of speculation to determine how these damages might have been lessened had the Funds adopted [special] measures"). Reasoning from Steamfitters is directly applicable:

> if the [Hospitals] are allowed to sue, the court would need to determine the extent to which their increased costs for smoking-related illnesses resulted from the tobacco companies' conspiracy to suppress health and safety information, as opposed to smokers' other health problems, smokers' independent (i.e., separate from the fraud and conspiracy) decisions to smoke, smokers' ignoring of health and safety warnings, etc. . . .[T]his causation chain is much too speculative and attenuated to support a RICO claim.

171 F.3d at 933 (footnote omitted). Like the Court in Steamfitters, we find that the Hospitals' injuries are indirect. Neither the duty to provide medical care, nor the direct or free provision of medical care, affects this conclusion.10

_____

10. The Hospitals raise the same arguments here as they did in support of their antitrust claims. For the same reasons as in that discussion, we reject those arguments.

    b. The Difficulty in Apportioning Damages Among
       Plaintiffs

Directly injured parties like the nonpaying patients are
unlikely to bring RICO claims against the Tobacco
Companies. We recognize, however, the uncertainty over
whether the collateral source rule would allow nonpaying
patients to recover health care costs which they did not
incur. For the same reasons as in our discussion of
antitrust standing, we decline to resolve this uncertainty
and assume that problems of apportionment would not be
significant.

    c. The Possibility of Other Plaintiffs Vindicating
       RICO's Goals

Again, it is unclear whether nonpaying patients can
recover from the Tobacco Companies, since the Hospitals
bore the burden of the unreimbursed medical expenses.
Thus, the Hospitals may be the most appropriate party to
vindicate the purposes of RICO. We assume other plaintiffs
are not willing to recover.

    d. Summary

In summary, while the Hospitals may be the best party to
vindicate RICO claims and problems of apportionment may
not be significant, "the remoteness of the[Hospitals']
alleged RICO injuries from any wrongdoing on the part of
the [T]obacco [C]ompanies" leads us to conclude that
proximate cause is lacking. Steamfitters, 171 F.3d at 933–
34. The differences between the Hospitals' injuries and the
union funds' injuries in Steamfitters are not significant
enough to overcome remoteness. Therefore, the Hospitals
lack standing to assert RICO claims.

C. Proximate Cause and Public Policy

Perhaps sensing that their antitrust and RICO claims are
materially the same as those dismissed in Steamfitters, the
Hospitals argue that justice and sound public policy dictate
that they have standing to sue. The Hospitals cite two
district court opinions that take this view. See Blue
Cross/Nat'l Asbestos Workers Medical Fund, 36 F. Supp. 2d

26

at 584 ("The moral blame attached to [the Tobacco Companies'] conduct, and society's policy in preventing harms in the future, could scarcely argue more strongly in favor of a finding of proximate cause."); Service Employees Int'l Union Health and Welfare Fund, 83 F. Supp. 2d at 84–85 ("If Plaintiffs can ultimately prove their allegations, can there really be any doubt that sound public policy demands that they be given an opportunity to do so?") (footnote omitted).

These cases are problematic. First, they are district court cases from other circuits. Second, the Courts of Appeals have neither approved nor adopted their holdings. See, e.g., International Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund, 196 F.3d at 827 ("[Judge Weinstein's] decision in [Blue Cross/Nat'l Asbestos Workers Medical Fund] fails to anticipate the second circuit's conclusion in Laborers Local 17 Health & Benefit Fund; the .. . decision is a thinly disguised refusal to accept and follow the second circuit's holding.") Third, to the extent those decisions offer a "justice-based" conception of proximate cause and standing for antitrust and RICO claims, they run contrary to Steamfitters.

For the record, we believe here that sound public policy argues against proximate cause and standing. When an injury is indirect, remote, and many steps away from the alleged cause, it is unadvisable to allow a case to proceed. See Palsgraf v. Long Island R.R. Co., 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting) ("What we do mean by the word `proximate' is that, because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point."). The Hospitals are dangerously close to asserting that they have standing to sue any company that causes a nonpaying patient's disease or illness. For example, could the hospitals sue a group of auto manufacturers for the unreimbursed costs of treating nonpaying patients injured in car accidents, simply by alleging that the manufacturers conspired to keep defective vehicles on the road? See Assoc. of Wash. Pub. Hosp. Dists., 79 F. Supp. 2d at 1226. We doubt that would be in the interests of public policy.

27

It is beyond dispute that the Tobacco Companies have engaged in "decades-long marketing of a product that we now know is demonstrably unsafe." Steamfitters, 171 F.3d at 927. At times, courts have ordered compensation. See, e.g., Amy Driscoll, Jurors Call $145 Billion Tobacco Verdict a `Message'; Florida Panel Members Say Record Award Is Firms' Penalty for Lying, Wash. Post, July 16, 2000, at A2 (a Florida jury returns $145 billion verdict in a class action suit against tobacco companies). We express no view on the propriety of such compensation. We simply hold that, due to the remoteness of the Hospitals' injuries, this third-party suit against the tobacco industry may not proceed. 11

## III. State Common Law Claims

In addition to their antitrust and RICO claims, the Hospitals raise numerous state common law claims. We find these to be without merit.

### A. Fraudulent Misrepresentation, Fraudulent Concealment, Negligent Misrepresentation and Omission, and Special Duty Claims (Counts VI, VII, VIII, and IX)

The Hospitals raise claims of fraudulent misrepresentation, fraudulent concealment, negligent misrepresentation and omission, and special duty against the Tobacco Companies. Proximate cause is an element of each of these claims. See Steamfitters, 171 F.3d at 934-35, 937 n.23. Here, proximate cause is lacking due to the remoteness of the Hospitals' injury in relation to the Tobacco Companies' alleged conspiracy and the speculativeness of damages. Therefore, the District Court

_____

11. Another parallel argument that the Hospitals raise is that we should interpret RICO standing broadly. (Br. of Appellant at 46 (citing Blue Cross/Nat'l Asbestos Workers Medical Fund and N.O.W. v. Scheidler, 510 U.S. 249 (1994)). As explained in the text, Judge Weinstein's Blue Cross/Nat'l Asbestos Workers Medical Fund opinion is questionable given prevailing Second Circuit doctrine. Moreover, Scheidler deals with an entirely different factual situation. See 510 U.S. 249 (plaintiff clinics alleged that defendants conspired to threaten staff and patients in order to destroy clinics' business). Generally, RICO should be interpreted broadly, but not so broadly as to eviscerate any connection between alleged wrongdoing and harm.

correctly dismissed these state common law claims. See id. at 934 ("The same principles that lead us to conclude that plaintiffs' antitrust and RICO claims were properly dismissed lead to the inevitable conclusion that their statelaw claims must also fail.").

B. Remaining Claims

The Hospitals' remaining claims of public nuisance, aiding and abetting and civil conspiracy, restitution, unjust enrichment, quantum meruit, and indemnity do not require proximate cause. The District Court therefore considered the merits of each. The Tobacco Companies urge this Court to read a proximate cause requirement into these claims, arguing that the remoteness doctrine and the direct injury requirement would be meaningless if plaintiffs could circumvent these principles by creative labeling of their claims. Since we agree with the District Court that the remaining claims fail on other grounds, we decline to adopt their suggestion.

    1. Public Nuisance Claim (Count X)

"[A] public nuisance is `an unreasonable interference with a right common to the general public.' " Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 315 (3d Cir. 1985) (quoting Restatement (Second) of Torts S 821B(1) (1979)). In order to recover damages in a private action for public nuisance, a plaintiff must have suffered a harm of greater magnitude and of a different kind than that which the general public suffered. See id.; see also Pennsylvania Soc'y for the Prevention of Cruelty to Animals v. Bravo Enters., Inc., 237 A.2d 342, 348 (Pa. 1968). The law requires greater and different injury because (1) it is difficult to "draw[ ] any satisfactory line for [any] public nuisance" and (2) "to avoid multiplicity of actions[,] invasions of rights common to all of the public should be left to be remedied by public action by officials." Restatement (Second) of Torts S 821C cmt. b (1979).

The District Court found that the Hospitals did not sufficiently allege that they suffered a harm different from and of greater magnitude than the harm suffered by the general public. We agree. The Hospitals' injuries are

29

derivative of the nonpaying patients' injuries, and the Hospitals are one of numerous parties in the public harmed by the alleged conspiracy. In these circumstances, remedying the source of the conspiracy is more properly a task for public officials. The District Court correctly dismissed the public nuisance claim.

   2. Aiding and Abetting and Civil Conspiracy Claims
      (Counts XI and XV)

Aiding and abetting and civil conspiracy claims require an underlying tort cause of action. See Strickland v. University of Scranton, 700 A.2d 979, 987-88 (Pa. Super. Ct. 1997) (elements of civil conspiracy); Caplan v. Fellheimer Eichen Braverman & Kaskey, 884 F. Supp. 181, 184 (E.D. Pa. 1995) ("[a] claim for civil conspiracy can proceed only when there is a cause of action for an underlying act"). The District Court dismissed the aiding and abetting and civil conspiracy claims for lack of an underlying action, and we uphold that dismissal. The Hospitals do not dispute this reasoning, though they argue that an underlying cause of action exists in the antitrust, RICO, and other state law claims.

   3. Restitution, Unjust Enrichment and Quantum Meruit
      (Counts XIII and XIV)

In discussing unjust enrichment claims, the Steamfitters Court explained:

      [i]n the tort setting, an unjust enrichment claim is
      essentially another way of stating a traditional tort
      claim. . . . [There is] no justification for permitting
      plaintiffs to proceed on their unjust enrichment claim
      once [it is] determined that the District Court properly
      dismissed the traditional tort claims . . .

171 F.3d at 936-37. Following this reasoning, the District Court dismissed the Hospitals' restitution and unjust enrichment claims against the Tobacco Companies since the traditional tort claims were properly dismissed. We believe this is a proper reading of Steamfitters.

The Hospitals now argue that their unjust enrichment

30

claim is not based in tort, but rather in an implied contract for the benefit they conferred on the Tobacco Companies by providing care to nonpaying patients.12  This argument dresses the unjust enrichment claim in quantum meruit terms. "Quantum meruit is a quasi-contractual remedy in which a contract is implied-in-law under a theory of unjust enrichment; the contract is one that is implied in law, and `not an actual contract at all.' " Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 998-99 (3d Cir. 1987) (quoting Ragnar Benson, Inc. v. Bethel Mart Assocs., 454 A.2d 599, 603 (1982)). The Hospitals' quantum meruit claim is based on the theory that by paying for the medical services required by nonpaying patients, the Hospitals discharged the Tobacco Companies' legal duties and saved them from bearing costs caused by their fraudulent and wrongful conduct. The District Court found this claim to be without merit.

We agree. "Unjust enrichment is . . . an equitable doctrine[, with the following elements:] benefits conferred on one party by another, appreciation of such benefits by the recipient, and acceptance and retention of these benefits under such circumstances that it would be inequitable [or unjust] for the recipient to retain the benefits without payment of value." 16 Summary of Pa. Jur. 2d Commercial Law S 2.2 (1994) (citing various cases). In the present case, the Tobacco Companies had no legal obligation to pay the medical expenses of smokers, and thus the Hospitals' provision of medical services did not "benefit" the Tobacco Companies by removing their obligation. Cf. Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris Inc., 185 F.3d 957, 968 (9th Cir. 1999) (discussing unjust enrichment under Oregon law)

_____

12. We reject the Hospitals' contention that there was an implied contract between the Hospitals and the Tobacco Companies in which the latter implicitly promised to compensate the Hospitals for unreimbursed medical care. The claim that the Hospitals reasonably expected to be paid is not supported by their factual allegations and is inconsistent with a major factual premise of their case -- that they did not know of the Tobacco Companies' conspiracy. Under no set of facts alleged can we find that the Tobacco Companies ever implicitly promised to pay for these services.

31

("Without a legal obligation on the part of defendants to pay, the payment by plaintiffs did not `benefit' defendants."). In addition, since the Hospitals had an independent obligation to provide health care to nonpaying patients, incidental benefit to the Tobacco Companies is not enough to maintain an action; the nonpaying patients got the main benefit, not the Tobacco Companies. See Restatement of Restitution S 106 (1937) ("A person who, incidentally to the performance of his own duty . . . has conferred a benefit upon another, is not thereby entitled to contribution.").

Even if some benefit went to the Tobacco Companies, it is unclear that allowing them to retain it is unjust. First, the benefit was incidental to the Hospitals' performance of its duty, and second, the Hospitals did not have a reasonable expectation of payment from the Tobacco Companies. See Aloe Coal Co. v. Department of Transp., 643 A.2d 757, 767 (Pa. Commw. Ct. 1994) (incidental benefit and lack of expectation by plaintiffs showed that benefit was not unjust). Lastly, the distance between the Hospitals' provision of medical care and the Tobacco Companies' alleged benefit show that the benefit was not unjust. For all these reasons we affirm the District Court's dismissal of the Hospitals' quantum meruit and unjust enrichment claims.

> 4. Indemnity Based on Intentional and/or Reckless
>    Conduct Claim (Count XII)

Under Pennsylvania law, indemnity is available only (1) "where there is an express contract to indemnify," or (2) where the party seeking indemnity is vicariously or secondarily liable for the indemnitor's acts. Richardson v. John F. Kennedy Mem'l Hosp., 838 F. Supp. 979, 989 (E.D. Pa. 1993). The Hospitals acknowledge that no express contract existed and that they are not secondarily liable. Thus, the District Court correctly held that, under Pennsylvania law, an action for indemnity is unavailable.

IV. Conclusion

For all the foregoing reasons, the District Court's dismissal of the Hospitals' complaint will be affirmed.

32

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

33